Eloise GONZALEZ, Plaintiff,

v.

**BETH ISRAEL MEDICAL CENTER, Defendants.**

No. 01 CIV. 1233.

United States District Court, S.D. New York.

May 22, 2003.

W.F. Van Den Houten, Staten Island, for Eloise Gonzalez, plaintiff.

Rory J. McEvoy, Kirkpatrick & Lockhart LLP, New York, for Beth Israel Medical Center, defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Eloise Gonzalez ("Gonzalez") brought this action against her former employer, Beth Israel Medical Center ("BIMC"), alleging sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq* ("Title VII"). Before the Court is BIMC's motion for summary judgment (the "Motion") to dismiss the complaint in its entirety. For the reasons described below, the Motion is granted.

## I. FACTS

As with many Title VII lawsuits, the case at bar presents a complicated narrative containing certain facts that are undisputed and other facts about which the parties completely disagree. For the sake of clarity, the Court divides the factual recitation into three sections. The first section begins when Gonzalez was originally hired by BIMC and ends when she was first terminated. The second section describes the period after she was terminated and before she was reinstated, and the third encompasses the period between her reinstatement by BIMC and her termination for the second time.

### A. GONZALEZ'S FIRST TERM OF EMPLOYMENT AT BIMC

Gonzalez began working at BIMC in January of 1997 as a Medicaid interviewer, a job in which she interviewed and assisted BIMC patients with no health insurance who needed to apply for Medicaid. At that time, she had two supervisors: Antonio Sanchez ("Sanchez") and Jose Cabrera ("Cabrera"). Cabrera, a twenty-three

year veteran of BIMC, served as Gonzalez's immediate supervisor, while Sanchez, who had been employed by BIMC for thirty years, supervised both Cabrera and Gonzalez. The two men had worked together in the same unit for fifteen years, but, according to Cabrera, did not socialize outside of work.

Upon commencement of her employment, Gonzalez received information describing two BIMC policies. The first, a tardiness policy (the "Tardiness Policy"), allows BIMC to progressively discipline an employee if she is more than five minutes late without an excuse three times within a two-week period or five times within a year (an "Excessive Lateness"). Under the Tardiness Policy, the first Excessive Lateness results in a verbal warning. After that, each successive Excessive Lateness within a 12–month period results first in a written warning, then a suspension, and finally a discharge.

When Gonzalez began working for BIMC in 1997, employees would write in their arrival times in a looseleaf binder, which was then converted into a word processed document by Deborah Simpson, Sanchez's secretary. It appears that at some point, a punch clock may have been used to the same effect, and then, sometime near the end of Gonzalez's tenure, BIMC converted to the Kronos system ("Kronos"),[1] which required employees to "swipe in" with their employee identification card at a magnetic card reading device connected to a computer.

The other policy affecting Gonzalez was BIMC's Anti–Harassment and Anti–Dis-crimination Policy (the "Harassment Policy"). The Harassment Policy forbids sexual harassment in the BIMC workplace, and provides for a complaint procedure governing the reporting and investigation of allegations of sexual harassment. On January 14, 1997, when she was first hired, Gonzalez received a copy of the BIMC Employee Handbook and a copy of the Harassment Policy, attended an orientation where the Harassment Policy was discussed, and signed a form attesting to her receipt of the policy and her attendance at the orientation.

As Assistant Director of Gonzalez's department, Sanchez had the authority to discipline workers, and eventually could have them fired pursuant to specific union disciplinary procedures. Beginning in her first year of employment, Gonzalez claims that Sanchez made several sexual advances towards her, such as trying to kiss her, touching her and leaving her inappropriate notes. She received the first such note on October 14, 1997. It read:

> 10/14/97
>
> Good morning precious—smile, for your smile awakens the heart! The day is heavenly only because you have opened your eyes and have joined us mere mortals in this everlasting journey—only your presence makes it tolerable to endure!!!
>
> T.

(Defendant's Exhibit H, attached to Gonzalez Dep.)

---

1. BIMC contends that Kronos was introduced in Gonzalez's department sometime in 2000, a date the Court presumes BIMC chose based on a comment in Cabrera's deposition. (*See* Deposition of Jose Cabrera, dated March 27, 2002 ("Cabrera Dep."), at 26.) However, the May 1999 warning Gonzalez received refers to Kronos. (*See* Defendant's Exhibit M, attached to Deposition of Eloise Gonzalez, dated Nov. 15, 2001 and January 28, 2002 ("Gonzalez Dep.").) Thus, the Court assumes that Kronos was in place at least as early as May of 1999. Indeed, Kronos was probably installed even earlier because the warning states that Gonzalez had a habit of not swiping in properly while using Kronos during the months leading up to the May 1999 warning. (*See id.*)

According to Gonzalez, over the next two and a half years Sanchez's inappropriate behavior persisted despite her repeated requests for him to stop. Gonzalez asserts that she did not report the harassment under the procedures outlined in the Harassment Policy because she hoped the conduct would end on its own, and because she did not want to lose her job or get Sanchez in trouble and cause him to lose his job, especially because he had a wife and kids. However, Sanchez continued to harass Gonzalez through phone calls, non-consensual touchings and six more notes, including one that read:

> Delicious is a word thats [sic] presented to describe a taste thats [sic] pleasing and fulfilling—no one can understand the true meaning of this word, unless they taste your lovely and appealing perfect TiTis!
>
> T.

(Defendant's Exhibit I, attached to Gonzalez Dep.)

Gonzalez alleges that the other five notes were similar in their level of sexual explicitness, and sometimes were accompanied by gifts. Gonzalez claims to have ripped up these other notes, except for the last one, which she received during an encounter in Sanchez's office in 2000 where he asked Gonzalez to leave the panties she was wearing with him and buy a new pair at a nearby Victoria's Secret lingerie store. The note read:

> I believe that Union Square has a store thats [sic] appropriate (V.Secrets) It will

be good [sic] walk to let the scents [unreadable]

(Defendant's Exhibit J, attached to Gonzalez Dep.) Gonzalez refused Sanchez's request, and left his office in tears.

During this same two-and-a-half-year period, Gonzalez received several warnings from Cabrera regarding her tardiness. The first, a verbal warning, was allegedly delivered on March 3, 1998 in response to her lateness on four different occasions during the month of January 1998. However, Gonzalez disputes that she ever received such a warning.[2] The second warning, a written warning, was delivered on May 11, 1999, and claimed that Gonzalez had been late for 21 days since January 1, 1999 and was not regularly swiping in her card using Kronos. This written warning, which Gonzalez read in the presence of her union delegate but refused to sign, also noted that Gonzalez was issued a verbal warning for lateness on July 7, 1998.

The third warning, delivered as a written warning on June 15, 1999, also accuses Gonzalez of lateness, this time on four different occasions between January 23 and June 12 of 1999. According to the warning, all of these occurrences happened during Gonzalez's weekend assignment.[3] Once again, Gonzalez read the document in the presence of her union delegate, but refused to sign it. The fourth warning, delivered on September 27, 1999 as a written warning, alleged that Gonzalez had been late on seven different occasions since her May 11, 1999 warning.[4] The

---

**2.** The verbal warning is written on a sheet identical to the ones given for written warnings, but is only signed by Cabrera, and does not indicate that Gonzalez ever saw the document. (*See* Defendant's Exhibit L, attached to Gonzalez Dep.)

**3.** The Court is unclear as to whether the occasions of lateness referred to in the June 15, 1999 warning—almost all of which took place

before the May 11, 1999 warning—are the same as the ones referred to in the May 11, 1999 warning.

**4.** Once again, the Court is unclear as to whether the post-May 11 lateness referred to in the June 15, 1999 warning is included in the seven occasions of lateness discussed in the September 27, 1999 warning.

warning added that Gonzalez was "being issued a final warning in lieu of suspension." (Defendant's Exhibit K, attached to Gonzalez Dep.) As before, Gonzalez read the warning in the presence of her union delegate, but refused to sign it.

With these series of warnings on her record, Gonzalez was called into Sanchez's office in April of 2000.[5] Gonzalez alleges that Sanchez expressed anger that he could not "have" her, and complained about her constant tardiness to work. (Gonzalez Dep. at 112.) Gonzalez claims that Sanchez then told her that because she had been late eight times in the past several months, she should resign, or he would fire her. Gonzalez disputed the number of times she had been late, refused to resign, and left the office.

Spurred by Sanchez's threat to fire her, Gonzalez filed a complaint with BIMC's Human Resources department on April 24, 2000. In the complaint, she reported the incidents of Sanchez's sexual advances recited above. Christopher Berner ("Berner"), a labor relations manager for BIMC, was assigned to investigate Gonzalez's allegations. As part of his investigation, Berner interviewed Gonzalez and Sanchez. He also interviewed Audrey Gomez ("Gomez") and Anne Lane, both of whom had worked for Sanchez at one point, and Catherine Dakis ("Dakis"), who was Sanchez's supervisor.

During the investigation, Sanchez admitted to Berner that he had authored the notes referred to above, but insisted that they had been written for himself as part of his hobby of writing poetry. He suggested that Gonzalez may have taken the notes from his unsecured office, but Berner did not find this claim to be credible.

During his conversation with Gomez, Berner claims that Gomez told him that Sanchez could be "a little fresh" and inappropriate and could make people feel uncomfortable. (Defendant's Exhibit 3, attached to Deposition of Christopher D. Berner, dated April 4, 2003 ("Berner Dep.").) Berner asserted that Gomez also confirmed that Sanchez had sent her a "romantic/sexy poem" as part of what she considered an attempt to encourage her to have sex with him. (*Id.*) When Berner asked her if Sanchez had ever said something to Gomez about her panties, Gomez's alleged response was: "I can't get into it." (*Id.*) Berner's notes about the conversation also include a quote from Gomez that Sanchez was "not a bad guy, but some people can't keep their dick in their pants." (*Id.*)

Berner's notes from his conversation with Dakis reveal less information, although Dakis did comment to Berner that she heard when she first came to BIMC eleven years earlier that Sanchez was flirtatious. Dakis also noted that Sanchez's department had been "wild" before Berner had started working at BIMC. (Defendant's Exhibit 4, attached to Berner Dep.) At his deposition, Berner clarified that Dakis meant the department had been difficult to manage because it had active union delegates and frequent disciplinary issues.

After completing his investigation, Berner notified Gonzalez by letter on Friday, May 5, 2000 that, while he could not substantiate the allegations that Sanchez had flirted with or attempted to kiss Gonzalez,

---

5. The parties seem to disagree on which date Sanchez told Gonzalez she would be fired. Gonzalez claims it was April 8, while BIMC alleges it was April 21. From a review of Gonzalez's deposition, the Court believes that the disagreement stems from an honest mis-reading of the deposition testimony. (*Compare* Gonzalez Dep. at 113 *with* Gonzalez Dep. at 165.) Regardless, the exact date is not significant in resolving the motion before the Court.

he had concluded that Sanchez had violated the Harassment Policy by sending Gonzalez personal notes. Consequently, Sanchez was suspended for two weeks without pay. Berner also concluded in the letter that Sanchez's improper conduct was not related to BIMC's decision to discharge Gonzalez. That following Monday, on May 8, Cabrera notified Gonzalez that she was being fired (the "First Termination"). The stated reason for her discharge was that since September 27, 1999, when she was issued a final warning in lieu of suspension, she had been late on eight separate occasions.

### B. *GONZALEZ'S APPEAL OF HER DISMISSAL*

Upon her termination, Gonzalez filed a grievance with her union, and as a result, Anita Miller ("Miller"), a lawyer in BIMC's human resources department, was assigned by BIMC to the case. On June 29, 2000, Miller conducted a three-step grievance hearing (the "Hearing"), at which Gonzalez, Cabrera, Berner and John Adler ("Adler"), who was Gonzalez's union delegate, were present. At the hearing, Gonzalez testified that she had not been late as many times as had been alleged, and that she suspected someone was tampering with her time records to make it appear that she was late. Cabrera testified that apart from her problems with attendance, Gonzalez was a good employee, and that no one had altered her time records.

That same month, Sanchez was terminated by BIMC as part of a substantial lay-off.[6] Meanwhile, while awaiting the ruling from the Hearing, Gonzalez filed her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 21, 2000 (the "First Charge"). The First Charge al-

leged that Sanchez had subjected Gonzalez to constant sexual harassment and that BIMC had discharged her shortly after she complained about the conduct.

One week later, on August 28, Miller sent a letter to Adler in which she presented her conclusion that the time sheet records only reported Gonzalez as being late on six occasions rather than the eight Cabrera had claimed in his discharge notice of Gonzalez, and therefore—despite the fact that the confirmed number of times of lateness would allow BIMC to terminate Gonzalez under the Tardiness Policy— Gonzalez's termination was not warranted. Miller also noted that there was no evidence that either anyone had tampered with Gonzalez's time records or that Sanchez's conduct was related to Gonzalez's attendance problems. Miller reinstated Gonzalez with back pay, and warned that continued violation of the Tardiness Policy would result in disciplinary action, including discharge.

### C. *GONZALEZ'S SECOND TERM OF EMPLOYMENT AT BIMC*

Gonzalez was reinstated in the same department she had worked in before, but since Sanchez had subsequently been fired by BIMC, Gonzalez was now supervised by Eric Phoa ("Phoa"), with Cabrera remaining as her immediate supervisor. Gonzalez claims she was soon targeted by Phoa and Cabrera, who gave her more work than other employees and more rigorously scrutinized her attendance. Gonzalez alleges that she asked Phoa for a transfer to another department, but was told that such a transfer would be difficult because of her legal proceedings against BIMC.

BIMC contends that after her reinstatement, Gonzalez continued her pattern of

---

**6.** Both parties agree that Sanchez was terminated as part of a standard BIMC lay-off, and

not because of his inappropriate conduct.

lateness, and on December 5, 2000, she was issued a disciplinary warning regarding five late arrivals and two unauthorized absences. A month later, on January 8, 2001, Gonzalez received a letter from the EEOC notifying her that its investigation stemming from the First Charge had not revealed any violations by BIMC regarding sexual harassment, and thus the investigation would not proceed. The EEOC letter attached a Notice of Right to Sue. Less than a month later, on February 1, 2001, Gonzalez was discharged based on four more alleged absences that had occurred since the December disciplinary warning.

On February 11, 2001, Gonzalez filed the instant lawsuit and ten days later, on February 21, 2001, she filed a second EEOC charge (the "Second Charge"), alleging that BIMC had retaliated against her for filing the First Charge. On May 1, 2001, the EEOC, at the request of Gonzalez, issued a right to sue letter regarding the Second Charge.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted only if the court determines on the record before it that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68 (2d. Cir.2000). The burden of showing that no factual dispute exists rests with the party seeking summary judgment. *See Celotex v. Cattrett,* U.S. 317, 322 (1986). In examining the evidence on the record to assess whether a genuine issue of material fact exists, the court must resolve doubts and ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's role is to determine whether there are issues of fact that require a trial, and not to resolve such disputed matters. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). If the record contains concrete evidence from which a rational trier of fact could render a reasonable verdict in favor of the non-moving party, summary judgment is improper. *See Anderson,* 477 U.S. at 248, 256, 106 S.Ct. 2505.

### B. SEXUAL HARASSMENT

Title VII was enacted by Congress in 1964 in order to ensure equality of employment opportunities for all citizens. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The statute provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1). Title VII has been invoked in particular to protect women from unwanted sexual advances in the workplace that affect their career prospects or working conditions. *See Karibian v. Columbia Univ.,* 14 F.3d 773 (2d Cir.1994) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (" ... sexual harassment in the workplace violates 'Title VII's broad rule of workplace equality.' ").

 Since the statute's enactment, two legal theories of sexual discrimination have become well-established. *See Gonzalez v. Police Com'r Bratton,* No. 96 Civ. 6330, 2000 WL 1191558, at *8 (S.D.N.Y. Aug.22, 2000). The first theory involves "quid pro quo" threats, where a supervisor uses "submission to or rejection of [unwelcome sexual] conduct by an individual ...

as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a)(2) (1993); *see also Karibian,* 14 F.3d at 777. This concept is distinct from the theory of a "hostile work environment," where "'discriminatory intimidation, ridicule and insult' ... is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Karibian,* 14 F.3d at 779 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). Under the "quid pro quo" theory, an employer is strictly liable for its supervising employee's sexually harassing acts because the supervising employee wields the employer's authority to alter the terms and conditions of employment. *See Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1158 (E.D.N.Y. 2003). However, under a "hostile work environment" theory, an employer is allowed to mount an affirmative defense in order to avoid liability. *See id.* Gonzalez asserts her claims in this action under both theories of harassment.

### 1. *Quid Pro Quo*

■ The Second Circuit has held that "[t]o establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Fitzgerald v. Henderson,* 251 F.3d 345, 356 (2d Cir.2001) (quoting *Karibian,* 14 F.3d at 777). The Supreme Court has further held that a plaintiff can demonstrate a change in the terms or conditions of employment that would be actionable under Title VII by proving that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

In regard to the first element of quid pro quo harassment, the Court is persuaded that a reasonable jury would find that Gonzalez was sexually harassed by Sanchez during her tenure at BIMC in an unwelcome manner, and in a way that could even be considered severe and pervasive. Such a conclusion is supported by the notes Sanchez wrote, which contained crass and vulgar language that could not be interpreted as innocent even under the most generous reading, in particular when considering that the notes were offered in a workplace setting. The existence of Sanchez's notes and the comments by Gomez and Dakis describing Sanchez's consistently inappropriate behavior also bolster Gonzalez's own contentions that Sanchez's sexually harassing acts were not limited to writing notes. Indeed, based on its investigation into the matter, BIMC's own human resources department concluded that Sanchez had sexually harassed Gonzalez.

Whether Gonzalez satisfies the second element of quid pro quo harassment, however, is not as clear-cut. First, there is disagreement among the parties as to whether Sanchez made the decision to terminate Gonzalez. BIMC contends that Cabrera made the decision based on Gonzalez's continuing lateness, and that Sanchez was not involved in the decision. However, this contention is questionable given Gonzalez's testimony that Sanchez told her he was going to fire her, and Berner's testimony that Sanchez told him that he was involved in the discharge. Given these facts, it is reasonable to conclude that Cabrera—over whom Sanchez had supervisory authority and whom Sanchez had worked with for fifteen years—would have been inclined to follow Sanchez's orders. Thus, viewing the facts in the light most favorable to Gonzalez, the non-moving party, the Court finds that a reasonable jury could conclude that Sanchez was involved with the decision to terminate Gonzalez.

Even if Sanchez was the decision-maker, the question remains as to whether the First Termination rises to the level of a "tangible employment action." BIMC argues that the First Termination does not qualify as such an action because "Gonzalez was returned to her prior position, received full back pay and did not suffer any negative impact on the conditions of her employment." (Memorandum of Law in Support of Defendant Beth Israel Medical Center's Motion for Summary Judgment, dated November 19, 2002, at 14.) Gonzalez refutes this contention, arguing that she did not return to the same employment status because she was placed under a higher level of scrutiny in regard to her attendance, was given a larger caseload than her colleagues, and was denied a transfer request. In addition, Gonzalez contends that by assigning her to work for Cabrera—who was upset about the suspension and eventual termination of Sanchez as well as BIMC's decision to reinstate Gonzalez on the basis of Cabrera's mistake in calculating how many times she had been late to work—she was being returned to a work environment where her next discharge was inevitable.

In defining "tangible employment action," the Supreme Court referenced a Seventh Circuit case that required a plaintiff arguing age discrimination to prove as part of his prima facie case that he had suffered a "materially adverse employment action." *Id.* at 761, 118 S.Ct. 2257 (citing *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)). The Court finds it significant that the Supreme Court, which could have merely imported the same "materially adverse" phrase, chose instead to replace "materially adverse" with "tangible." While many courts tend to blur the two concepts and "[c]ourts have yet to address the differences between them," the Court agrees with the Third Circuit that "[t]he concept of a tangible employment action is distinct from that of a materially adverse employment action ...." *Suders v. Easton,* 325 F.3d 432, 435 n. 1 (3rd Cir.2003).

■ But how these terms are distinct is unclear. Some guidance addressing this uncertainty is contained in the discussion of a "tangible employment action" that follows the Supreme Court's initial definition of the phrase. That definition offered concrete examples of such actions:

A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The use of the phrase "such as" demonstrates that the Supreme Court meant the examples to be merely instructive, not exclusive. *See Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 93 (2d Cir.2002) ("the definition [of tangible employment action] given by the Supreme Court is non-exclusive."). More important to the analysis is the Supreme Court's use of the phrase "significant change in employment status," perhaps indicating a less rigid standard under which a meaningful modification to an employee's job conditions could qualify as actionable even if the change could not be considered "materially adverse."

However, by this reading the Court does not suggest that the Supreme Court intended "bruised egos" or job reassignments that cause the employee no materially significant disadvantage to be actionable. *See Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (using such examples from other cases to demonstrate what would not be considered a tangible employment action). Rather, the Court construes the Supreme Court's meaning to include improperly motivated conduct by supervisors that brings "the official power of the enterprise to

bear on subordinates," negatively impacting the worker's employment status in a significant, but not necessarily materially adverse, way. *Id.* at 762, 118 S.Ct. 2257; *see also* Rebecca Hanner White, *De Minimis Discrimination,* 47 Emory L.J. 1121, 1158 (1998) ("[T]he occurrence of an improperly motivated official company act is the equivalent of a tangible employment decision for which the employer is liable. It need not be ultimate nor materially adverse, but it must involve an act 'within the special province of the supervisor.' ").

■ With the aid of this clarification, the Court turns to application of the appropriate standard to the instant case. It is undisputed that upon being reinstated in August of 2000, Gonzalez was returned to her former job at the same wage with back pay. Thus, the Court is not concerned with the financial impact on Gonzalez or whether Gonzalez's work responsibilities were the same, but instead with whether the status or conditions of her employment may have significantly changed in a negative way based on the improper motives of her supervisors being brought to bear upon her.

First, Gonzalez contends that upon reinstatement, she was placed under a higher level of scrutiny. Phoa admitted in testimony that Gonzalez was placed on final warning status as soon as she was reinstated, which meant that if she had another Excessive Lateness, she would be fired. (Deposition of Eric Phoa, dated April 8, 2002, ("Phoa Dep."), at 25.) Moreover, Phoa testified that because of Gonzalez's prior attendance problems, he and Berner corresponded by e-mail about Gonzalez's attendance issues in order to memorialize the decision process and demonstrate that

Phoa had support from human resources if he decided to discharge Gonzalez. (*Id.* at 34–35.) Phoa asserts that he did not correspond by e-mail with Berner about any other employees because no one else was on the same level of discipline as Gonzalez. (*Id.* at 35.)

The Court does not find sufficient evidence on the record before it from which a rational jury could reasonably determine that Phoa's action was improperly motivated in any way. Rather, the record demonstrates that Phoa's action was consistent with BIMC's enforcement of the Tardiness Policy, especially considering that Gonzalez's records during her first term of employment with BIMC showed that she had been late many times in violation of the Tardiness Policy, and had received several warnings verbally and in writing regarding her tardiness. Indeed, for BIMC to reinstate Gonzalez and thereafter act as though she had never been late to work during her first term of employment would have made little sense because Gonzalez's reinstatement was based not on a conclusion that she had never been late, but rather on a determination that the *number* of times she had been late—in any event still sufficient to support termination—was miscounted.[7] By the same token, Gonzalez's grievance implicitly reflects another unwarranted and unreasonable expectation: that, notwithstanding her prior long-standing, documented history of lateness, she was entitled to resume working free from any special scrutiny of her time records, or subject only to the ordinary monitoring that would apply to employees who have had no disciplinary problems under the Tardiness Policy.

---

**7.** The Court notes that neither party is able to articulate, either through discovery or their briefing papers, exactly what was wrong with the two instances of lateness Cabrera identified that Miller later determined were incor-

rect. Because there is no evidence presented to demonstrate that the discrepancy was a part of a pattern of altering the time records of Gonzalez, the Court discounts its relevance.

Gonzalez's response—and a continuing accusation throughout her complaint—is that her time records were altered by Sanchez during her first term of employment, and by some unspecified individual during her second term of employment. However, after being afforded full discovery, Gonzalez fails to produce any direct evidence of record tampering or circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact. Gonzalez's conclusory and speculative assertions that the time records are incorrect are not enough to withstand summary judgment. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) ("non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to survive summary judgment). Consequently, the Court finds that BIMC correctly disciplined Gonzalez for well-documented instances of lateness.

Gonzalez also claims that she was given more work than her co-workers. (*See* Gonzalez Dep. at 255.) Once again, Gonzalez produces no direct or circumstantial evidence to support this charge, and the Court is left with Gonzalez's own self-serving statement, which is insufficient to withstand summary judgment. *See Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42 (2d Cir.1986) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny" the motion) (internal quotation marks omitted). The same failure to provide evidence adversely affects her allegation that Cabrera conspired to ensure her discharge during her second term of employment with BIMC. Gonzalez provides no evidence whatsoever that Cabrera did anything improper in the course of monitoring her timeliness. Even crediting Gonzalez's charge that Cabrera disliked her, and that he may have been upset that she was reinstated, such feelings alone cannot lead a reasonable jury to find, on the record before the Court, that Gonzalez was terminated for anything other than her consistent pattern of lateness.

Gonzalez's request for a transfer to another BIMC office in Brooklyn also fails to raise a genuine issue of material fact for a jury. While there is a dispute between Gonzalez and Phoa over whether or not Gonzalez asked for a transfer, even if the Court assumes that Gonzalez did ask for a transfer and was told by Phoa that it would be hard to do because of her legal proceedings against BIMC, the Court still must consider the undisputed fact that Gonzalez never officially applied for a transfer because "she felt it would be useless." (Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment, dated January 3, 2003, at 22.) The Supreme Court's explicit use of the word "tangible" in describing the type of employment action that must occur precludes the Court from considering as evidence an expected denial to a transfer request that was never officially made.

Gonzalez also testified that a colleague, Fay Markman ("Markman"), told her that her supervisors were "out to get" her. (Gonzalez Dep. at 255.) Even if Markman made such a statement, the Court considers it unsubstantiated hearsay that cannot be utilized as proof of the intent of Gonzalez's supervisors. Markman did not claim to have direct evidence of such a conspiracy against Gonzalez, and the Court has no way of ascertaining how Markman would be in a position to have any sort of knowledge about the supervisors' planned actions. As a result, Gonzalez's claim under quid pro quo harassment fails to raise a genuine issue of material fact.

#### 2. *Hostile Work Environment*

■ Gonzalez also alleges that on account of Sanchez's harassing behavior, she was subjected to a hostile work environ-

ment at BIMC. To survive summary judgment on a Title VII claim of hostile work environment sexual harassment against an employer on the basis of an employee's conduct, a plaintiff must plead a prima facie case by establishing two elements: (1) that the harassment permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment; and (2) that she has a "specific basis for imputing the hostile work environment to the employer." *Robles v. Cox & Co., Inc.,* 154 F.Supp.2d 795, 803–04 (S.D.N.Y.2001).

Gonzalez fulfills the first prong of the test, and BIMC apparently does not argue this point. As mentioned previously, Sanchez's harassing conduct was demonstrated directly from the notes he gave to Gonzalez and was confirmed by comments from Gomez and Dakis about his tendency to engage in inappropriate behavior in the workplace.

However, Gonzalez cannot meet her burden with regard to the second prong. While an employer is presumed responsible for the hostile work environment where the perpetrator of the harassment was a supervisor with immediate or successively higher authority over the employee, *see Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257, BIMC is allowed to raise an affirmative defense to liability as a result of the Court's ruling above that Gonzalez has not produced evidence sufficient to establish that she suffered a tangible employment action. Thus, to rebut Gonzalez's claim, BIMC must prove two elements: (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that Gonzalez unreasonably failed to take advantage of any preventive or corrective opportunities provided by BIMC or to avoid harm otherwise. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

As the Second Circuit has noted, "[a]lthough not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether an employer has satisfied the first prong of this defense." *Caridad v. Metro–North Commuter Railroad,* 191 F.3d 283, 295 (2d Cir.1999); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."); *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 491 (S.D.N.Y. 1998) (noting that the existence of an anti-harassment policy with complaint procedure is "an important, if not dispositive, consideration").

It is not disputed that BIMC had a Harassment Policy, which Gonzalez acknowledged having reviewed when she commenced employment with BIMC, and which contained a clear procedure for filing complaints. Indeed, Gonzalez utilized the Harassment Policy and her complaint was immediately investigated. Moreover, within eleven days of Gonzalez filing the complaint, a finding was made that Sanchez had sexually harassed Gonzalez and Sanchez was punished for his conduct as a result. Such a prompt response demonstrates that BIMC made a good-faith effort to investigate and remedy problems reported by its employees, and, in respect to this issue, is "sufficient to remove any question of fact as to [BIMC]'s liability." *Wahlstrom v. Metro–North Commuter R. Co.,* 89 F.Supp.2d 506, 525 (S.D.N.Y.2000)

(fact that investigation began as soon as complaint was made and all witnesses were interviewed within two days demonstrated employer took prompt action); *see also Caridad*, 191 F.3d at 295 (employer's good-faith efforts to resolve sexual harassment complaints demonstrates adequate anti-harassment policy).

■ Gonzalez contends that the investigation was flawed and inadequate because there was not a proper inquiry into her allegation that her time records were altered. She cites *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414 (S.D.N.Y.1998), to bolster her contention that such an allegation concerning the inadequacy of a sexual harassment investigation raises a question of fact that is inappropriate for summary judgment. However, the Court's reading of *Ponticelli* leads it to the opposite conclusion. In *Ponticelli*, a female employee who accused certain supervisors of sexual harassment went to complain to the Vice President of Human Resources, who was designated by the employer to receive and investigate claims of sexual harassment. *See id.* at 430–31. The Vice President allegedly responded to the allegations by telling the employee "that he thought there was nothing wrong with having a sexual relationship with someone at work as long as it was mutually agreed upon ..., that [the employee] was very attractive and ... that she should enjoy herself a little." *Id.* at 431. Based on these allegations, the trial court concluded that there were serious questions as to the adequacy of the company's anti-harassment policy.

Here, Berner received Gonzalez's complaints in a professional manner, and interviewed several individuals involved with the situation in a timely fashion. His notes from these interviews indicate that he was thorough in his questioning, and elicited valuable information that led him to the conclusion that Sanchez had violated the Harassment Policy. While Gonzalez complains that this investigation did not adequately explore her conclusory allegations of time record tampering, the Court has already addressed the complete lack of direct or circumstantial evidence that Gonzalez has produced to support her unsubstantiated contention that the records were altered. If Gonzalez—with the full subpoena power of the federal courts behind her—could not uncover such evidence in the several months of discovery available to her, the Court is not inclined to conjecture that Berner could have achieved better results.

■ Gonzalez also asserts that BIMC did not sufficiently punish Sanchez. Though Gonzalez has the right to believe Sanchez should have received a more stern punishment, "nothing gives her the right to choose the penalty for her harasser." *Wahlstrom*, 89 F.Supp.2d at 526. An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be "sufficiently calculated to end the harassment." *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995). As the Second Circuit has recognized, "not every response to a complaint should take the form of discharge." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992) This Court has noted that "even a mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated." *Wahlstrom*, 89 F.Supp.2d at 526. Given that BIMC suspended Sanchez for two weeks without pay, and that there is no evidence on the record to indicate that Sanchez engaged in any further misconduct towards Gonzalez or any other BIMC employee, or that this punishment was otherwise unsuccessful, no reasonable jury

could find from such punishment that BIMC neglected its obligation to take prompt and effective action to remedy Sanchez's wrongdoing. *See id.* ("By far the best evidence that [the defendant]'s response was effective is that plaintiff has not been sexually harassed by [the alleged harasser] or any other [of defendant's employees] since [reporting the harassment] nor has [the alleged harasser] been accused of accosting any other employees since returning from his suspension.") (citations omitted).

Finally, Gonzalez contends that BIMC made a serious error by giving Cabrera the power to determine whether to fire Gonzalez during her second term of employment. However, Cabrera's decision to fire Gonzalez was based on objective evidence that she had consistently violated the Tardiness Policy. Since Gonzalez has not provided sufficient evidence on the record to establish that this objective evidence was incorrect, the Court is satisfied that regardless of who made the decision, any reasonable jury would find that the end result would have been the same based on the clear showing that Gonzalez had violated the Tardiness Policy.

With respect to the second prong of the affirmative defense, the Supreme Court has required employers to show that the employee unreasonably failed to take advantage of its sexual harassment complaint procedures. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257 (evidence of "any unreasonable failure [by the employee] to use any complaint procedure provided by the employer .... will normally suffice to satisfy the employer's burden under the second element of the defense.") As this Court has noted, placing the burden on employees is logical because they are the ones with direct knowledge of the harassment and without their participation, "Title VII's remedial and deterrent purposes would not be served." *O'Dell v. Trans World Enter-*

*tainment Corp.,* 153 F.Supp.2d 378, 390 (S.D.N.Y.2001); *see also Faragher,* 524 U.S. at 805–06, 118 S.Ct. 2275 ("Although Title VII seeks to make persons whole for injuries suffered on account of unlawful employment discrimination, its primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm.") (quotation marks and citations omitted).

In analyzing whether an employee acted unreasonably in failing to avail herself of an employer's internal complaint procedures, the Second Circuit has employed a burden-shifting analysis. The employer has the initial burden of demonstrating that its employee has failed to avail herself of the employer's complaint procedures. *See Leopold v. Baccarat, Inc.,* 239 F.3d 243, 246 (2d Cir.2001). The burden then shifts to the employee to come forward with one or more reasons why she did not make use of the procedures. *See id.* An employee's "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint" satisfies the employee's burden. *Caridad,* 191 F.3d at 295.

It is undisputed that Gonzalez let the harassment continue for two and a half years and went to complain only when threatened with termination by Sanchez for her consistent lateness. Gonzalez claims that she did not complain because she hoped that Sanchez's conduct would end if she told him to stop and avoided situations where he could harass her, and that she was concerned about reporting him because it might cause both of them to lose their jobs and Sanchez had a family that would be adversely effected. This Court has held that in similar cases, a lengthy delay of as little as a year is sufficient by itself to demonstrate unreasonable failure to take advantage of an

employer's preventive and corrective opportunities. *See O'Dell,* 153 F.Supp.2d at 391 (finding employer had met burden because employee waited almost a year to report harassment); *Dayes v. Pace Univ.,* No. 98 Civ. 3675, 2000 WL 307382, at *6 (S.D.N.Y. Mar.24, 2000) (granting employer summary judgment on its affirmative defense where plaintiff delayed one year before reporting supervisor's harassment), *aff'd,* 2 Fed.Appx. 204, 205 (2d Cir.2001). Moreover, Gonzalez's speculative and unsubstantiated reasons for not reporting the harassment are not recognized by courts as valid excuses for such delay. *See O'Dell,* 153 F.Supp.2d at 391 (requiring plaintiff "to come forward with evidence that her failure to avail herself of [defendant's] remedial procedures was caused by a credible fear that her complaint would not be taken seriously or that she would suffer an adverse employment action."); *Fierro,* 13 F.Supp.2d at 492 (requiring plaintiff to offer more than fear of "unspecified repercussions and an unpleasant outcome" in order to survive summary judgment). Thus, the Court is not persuaded that Gonzalez has provided adequate evidence to rebut BIMC's affirmative defense. Accordingly, the Court determines that BIMC has established the *Faragher/Burlington* affirmative defense, and that BIMC's motion for summary judgment must be granted with respect to Gonzalez's hostile work environment claim brought pursuant to Title VII.

## C. *RETALIATION*

■ Gonzalez's final claim is that either one or both of her discharges were motivated by retaliation for her complaints about Sanchez's conduct. To prevail on a claim of retaliation under Title VII, a plaintiff must provide sufficient evidence to establish a *prima facie* case comprised of the following elements: (1) participation in a protected activity; (2) knowledge by the employer of the employee's protected ac-

tivity; (3) adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir.1999).

■ While it is not disputed that Gonzalez engaged in a protected activity—namely, reporting the sexual harassment—and that BIMC had knowledge of it, the Court repeats its previous conclusion that Gonzalez has failed to provide sufficient evidence that she was subject to a tangible employment action, much less an adverse one. *See Parrish v. Sollecito,* 257 F.Supp.2d 700 (S.D.N.Y.2003) ("The standard for determining an adverse employment action is whether it caused a materially adverse change in the terms, privileges, duration and conditions of employment ... [and a] material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity.") (quotation marks and citations omitted). Moreover, because Gonzalez cannot prove that her instances of lateness were compiled incorrectly, no reasonable jury could find that her discharges were motivated by anything other than her supervisor's intent to enforce the Tardiness Policy. Consequently, Gonzalez fails to establish a prima facie case of retaliation.

■ Even assuming that Gonzalez did establish a prima facie case, BIMC has articulated a legitimate, non-retaliatory reason for her termination—namely, her consistent pattern of lateness. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 81 (2d Cir.2001) (stating that once plaintiff makes out a prima facie case of retaliation, burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the allegedly retaliatory act). Examining the record as a whole in light of the legitimate reasons BIMC proffered for dismiss-

ing Gonzalez, and assuming Gonzalez could establish the elements of a prima facie case of discriminatory discharge, no reasonable jury could conclude that the grounds BIMC articulated are false and merely a pretext for retaliation for protected activity. *See Dawson v. Bumble & Bumble,* 246 F.Supp.2d 301, 324 (S.D.N.Y. 2003) (concluding that defendant's reasons for discharge could not lead reasonable jury to conclude that such reasons were pretext for discrimination on the basis of gender).

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that Defendants' motion for summary judgment is granted.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**