Maria STEPHENY, Plaintiff,

v.

**BROOKLYN HEBREW SCHOOL FOR SPECIAL CHILDREN, Defendant.**

Gregory Stepheny, Plaintiff,

v.

Brooklyn Hebrew School for Special Children, Defendants.

Nos. 03–CV–3936 (ILG), 03–CV–3937 (ILG).

United States District Court, E.D. New York.

Feb. 17, 2005.

---

**17.** Section 4351 was amended twice before, in 1990 and 1994, but these amendments did not involve subdivision (7).

Louis Ginsberg, Law Firm of Louis Ginsberg, P.C., New York, NY, for Plaintiffs.

John E. Kiley, Kiley & Park, Great Neck, NY, for Defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

Plaintiffs Maria ("Maria") and Gregory ("Gregory") Stepheny (collectively, "Plaintiffs"), a married interracial couple, bring these employment discrimination suits against their former employer, the Brooklyn Hebrew School for Special Children ("Defendant" or the "School").[1] Maria Stepheny alleges claims of a racially hostile work environment, race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "Executive Law"), *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* (the "Administrative Code"). Gregory Stepheny alleges claims of a sexually hostile work environment and retalia-

---

1. Since the filing of these cases, Defendant has changed its name to Block Institute, Inc. (Declaration of Scott L. Barkin executed on September 17, 2004 ("Barkin Decl.") ¶ 4).

tion, in violation of Title VII, the Executive Law and the Administrative Code.

Plaintiffs were terminated in May 2001 after a verbal and physical altercation with co-workers in the School's parking lot at the end of the work day. The altercation was precipitated by a more than five month dispute that had been festering between Plaintiffs and Nekeya Black, a co-worker, with whom Gregory had a brief extramarital affair. After Gregory informed Ms. Black that he no longer wanted to continue their relationship, and after advising his wife about it, Plaintiffs and Ms. Black had frequent confrontations at work which poisoned the work environment.

Defendant argues that Plaintiffs have failed to proffer any evidence of discrimination. The School asserts that to the extent that Maria or Gregory were treated disparately or were "harassed," it occurred not on account of their gender or race, but because of the affair and the conduct which it spawned. Moreover, even assuming that Plaintiffs have submitted evidence of alleged unlawful discrimination, Defendant submits that Plaintiffs were terminated for legitimate, nondiscriminatory reasons which Plaintiffs have not shown are untrue or are a pretext for discrimination. For similar reasons, Defendant argues that it is entitled to judgment as a matter of law on Plaintiffs' hostile work environment and retaliation claims. In opposition, Plaintiffs contend that material issues of fact exist on all of their claims.

For the reasons that follow, Defendant's motion for summary judgment is granted.

### BACKGROUND

The following facts are viewed in the light most favorable to Plaintiffs. Defendant is a not-for-profit agency serving mentally retarded and physically disabled children and adults with two locations in Brooklyn, New York. (Barkin Decl. ¶ 4).

Maria, who is Caucasian, and Gregory, who is African–American, joined the School as substitute assistant group leaders, in January 1995 and December 1994, respectively. (Declaration of Mary Ellen O'Driscoll ("O'Driscoll Decl.") executed on September 17, 2004 ¶¶ 3, 5; deposition of Maria Stepheny ("Maria Dep."), attached as Exhibit C to the declaration of John E. Kiley executed on September 17, 2004 ("Kiley Decl.") at 9, 14; deposition of Gregory Stepheny ("Gregory Dep.") attached as Exhibit F to the Kiley Decl. at 10). In March 1995, almost immediately after their employment commenced, Maria and Gregory entered into a sexual relationship. (Maria Dep. at 93–94; Gregory Dep. at 69). They were married in February 1998. (*Id.*) The School did not interfere with or adversely react to their decision to get married. (O'Driscoll Decl. ¶ 8).

Maria was promoted to the position of assistant group leader in March 1997, and to the position of group leader in September 2000. (Maria Dep. at 9, 15; O'Driscoll Decl. ¶¶ 6–7). Gregory was promoted to the position of group leader in December 1994, only twelve days after he was hired. (O'Driscoll Decl. ¶ 4). Plaintiffs held the positions of group leader when they were terminated.

Group leaders of Defendant's program called "Training Retarded In Useful Service" ("TRIUS") develop and administer the services that are provided to the adults with severe developmental disabilities who participate in the program. (Barkin Decl. ¶¶ 6, 7). They must work as a team with one or more assistant group leaders to ensure the seamless provision of services. (Kiley Aff. Exh. D & E, Maria Dep. at 20). Group leaders and assistant group leaders report to case coordinators, who in turn report to the TRIUS assistant director. (Barkin Decl. ¶ 7). The TRIUS assistant director reports to the TRIUS director,

who reports to the director of program operations. (Maria Dep. at 27–28, 156).

Defendant hired Nekeya Black ("Ms. Black") in July 2000 as a substitute assistant group leader. (Defendant's Statement of Undisputed Facts ("Def's. 56.1 Statement") ¶ 25). Initially, she was assigned to different groups, including one supervised by Gregory. (*Id.*). In September 2000, she was assigned to work permanently with Maria's group after she was promoted to the position of assistant group leader. (*Id.* ¶ 26). Shortly thereafter, in approximately late September or early October 2000, Gregory had a two-week affair with her. (*Id.* ¶ 28). Gregory gave Ms. Black money, at least $40, and other gifts during this time period. (*Id.* ¶ 28). After their second sexual encounter, Gregory telephoned her and told her that he was terminating their relationship. (*Id.* ¶ 29). Ms. Black reacted angrily and told him that she believed he had taken advantage of her. (*Id.*)

Ms. Black told her co-workers about her affair with Gregory, including details about their sexual relationship, because she was angry with him and she wanted to continue the relationship. (Def's. 56.1 Statement ¶¶ 30, 34; Plaintiffs' Counter–Statement of Undisputed Facts ("Pls. 56.1 Statement") ¶ 30). As a result, Plaintiffs' co-workers' "attitudes" towards them changed for the worse, and vacillated between supporting Gregory and "hating him" because of how he had treated Ms. Black. (Def's. 56.1 Statement ¶¶ 30–32, Pls. 56.1 Statement ¶¶ 30–32). Co-workers spoke directly to Gregory about his sexual relationship with Ms. Black. He knew that Ms. Black was telling co-workers about their affair because he had not told anyone about it. (Pls. 56.1 Statement ¶ 32). In response, Gregory ignored Ms. Black in the workplace, which made her angrier. (Def's. 56.1 Statement ¶ 34).

In late November or December 2000, Gregory told his wife about his affair, recognizing that otherwise she may learn about it from their co-workers. (Def's. 56.1 Statement ¶ 38). Maria subsequently told Ms. Black that she knew about the affair.[2] (Maria Dep. at 116–17). In response, Ms. Black told Maria, among other things, that Gregory did not know how to tell her about the affair, that he wants to leave her, and that he never loved her. (*Id.* at 117). As a result, Maria trusted Ms. Black even less than she had prior to learning about the affair. (*Id.* at 125).

Following this conversation, Ms. Black began to make offensive and threatening comments to Maria, including calling her a "white bitch," or remarking that she should "watch [her]self, I know where you live." (Def's. 56.1 Statement ¶ 41). Maria does not recall Ms. Black having ever used the term "white bitch" prior to her becoming aware of her husband's affair. (Maria Dep. at 113). In December 2000, both Maria and Ms. Black complained about each other to Alicia Geraci, then the TRI-US assistant director. (Declaration of Alicia Geraci executed on September 17, 2004 ("Geraci Decl.") ¶ 8). In meetings with Ms. Geraci, Ms. Black said that Maria regularly cursed at and threatened her.[3] Neither Maria nor Ms. Black told Ms. Geraci about the affair. (*Id.* ¶¶ 8–10).

In early January 2001, Ms. Black told Dr. Scott Barkin, then the School's director of program operations, about her affair with Gregory, that he had broken it off, and that she was being harassed by Maria. (Barkin Decl. ¶ 10). Dr. Barkin

---

2. Before Maria was aware about her husband's affair, Ms. Black would constantly ask her questions about her marriage to Gregory. (Maria Dep. at 113).

3. At her deposition, Maria denied that she used profanity in the workplace. (Maria Dep. at 126).

told Ms. Black that the School would investigate the matter, cautioned her to maintain her professionalism on the job and to report any future harassment. (Def's. 56.1 Statement ¶ 44).[4]

Dr. Barkin convened a meeting with TRIUS director, Liz Warren, and Ms. Geraci, to discuss Ms. Black's complaint and the affair she had with Gregory. (Barkin Decl. ¶ 11). In light of Ms. Black's complaint, and given the deteriorating morale in the workplace caused by the animosity that had developed between her and Plaintiffs, the Center transferred Ms. Black from Maria's group effective January 19, 2001. (Def's. 56.1 Statement ¶ 49). Ms. Geraci met with Maria to inform her about the School's decision, and explained that management was extremely concerned about the effect that the animosity between Plaintiffs and Ms. Black was having in the workplace.[5] (Id. ¶ 48; Pls. 56.1 Statement ¶ 48).

On January 31, 2001, Ms. Black and Maria had a verbal altercation in the cafeteria. (Def's. 56.1 Statement ¶ 50). There is a dispute as to what exactly the two women said to each other. Maria claimed that Ms. Black told her "I'm gonna get your husband," and Ms. Black claimed that Maria told her to "stay away from my husband."[6] (Pls. 56.1 Statement ¶ 50). That same day, Ms. Geraci met with Maria and Ms. Black separately and instructed them that they were prohibited from discussing their personal issues in the workplace. (Def's. 56.1 Statement ¶ 51). Ms. Geraci sent both women warning letters dated January 9, 2001 stating that their inability "to separate personal from professional issues can lead to your dismissal." (Def's. 56.1 Statement ¶ 52). Although Maria claims that she never received the letter from Ms. Geraci, she acknowledges that on or after March 9, 2001, she was warned that her unprofessional conduct with Ms. Black may result in her termination. (Id.)

In February 2001, Ms. Geraci repeatedly met with Plaintiffs and Ms. Black because their continuing interpersonal conflict was detrimentally affecting the workplace. (Def's. 56.1 Statement ¶ 54). Later that month, Dr. Barkin and Ms. Geraci met with Maria and Ms. Black separately, and each woman com-

4. In their "counter 56.1 statement," Plaintiffs deny for lack of "knowledge and information" at least 30 of Defendant's undisputed material facts. (Pls. 56.1 Statement ¶¶ 24, 42, 43–47, 51–57, 60–62, 65, 68–70, 77–79, 81–85, 88). This is improper. Local Civil Rule 56.1(c) states that "[e]ach numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Parties are therefore prohibited from attempting to raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of "knowledge and information" because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them. The fact that Plaintiffs did not take any depositions in this case is of no moment. See, e.g., Delphi–Electro Electronics Systems v. M/V Nedlloyd Europa, 324 F.Supp.2d 403, 425 & n. 13 (S.D.N.Y. May 5, 2004) (party's assertion in response to Local Rule 56.1 statement "that it has no information to confirm or deny" claimed undisputed facts is a "vague response" that "is insufficient to create a genuine issue of fact"). Therefore, to the extent that Plaintiffs have denied statements for lack of "knowledge and information," they will be deemed admitted.

5. Maria believed that Ms. Black was being transferred due to the informal complaints she had submitted to Ms. Geraci against Ms. Black regarding the threats that she made against Maria. (Maria Dep. at 131).

6. Maria claims that Ms. Black also called her a "white bitch" to which she did not respond. (Pls. 56.1 Statement ¶ 50).

plained that the other was engaging in harassing and threatening behavior. (*Id.* ¶ 55). Dr. Barkin again warned them that they should not allow their personal animosity for each other to be brought into the workplace. (*Id.*)

Nonetheless, the dispute between Plaintiffs and Ms. Black continued and intensified. Maria complained that Ms. Black was continuing to threaten her and calling her a "white bitch," while Ms. Black complained that the Stepheny's were continuing to harass and threaten her. (Def's. 56.1 Statement ¶ 56). Ms. Black also claimed that Gregory was "stalking her." (*Id.*) During this time, Ms. Black submitted her resignation due to the "physical and mental cruelty" directed against her by Plaintiffs. (*Id.* ¶ 57). However, Ms. Black later rescinded her resignation and never stopped working for the School. (*Id.* ¶ 57).

Because the conflict between Plaintiffs and Ms. Black continued unabated, Dr. Barkin called a meeting on March 9, 2001, attended by Plaintiffs, Ms. Black, their union representative, Ms. Geraci and Ms. Warren, at which time he forcefully told the parties that the School would no longer tolerate their personal dispute in the workplace. (Def's. 56.1 Statement ¶ 58). This was the first time that Gregory attempted to report his claim that Ms. Black was sexually harassing him, which he claims he was prevented from doing until then. (Pls. 56.1 Statement ¶ 58).

The personal antagonism between Plaintiffs and Ms. Black continued to spill over into the workplace following the March 9, 2001 meeting. As a result, co-workers began to become increasingly involved and took sides. (Geraci Decl. ¶ 23). Maria believed that all, or virtually all, of the 36 other TRIUS group leaders and assistant group leaders, some of them white, sided with Ms. Black and disliked her. (Def's. 56.1 Statement ¶ 63). Plaintiffs com-

plained to Ms. Geraci about Ms. Black's alleged campaign of harassment against them, including the threats she issued to Maria and her name calling, including use of the term "white bitch." (*Id.* ¶ 59). In March 2001, Maria submitted a formal written account of Ms. Black's conduct to Ms. Geraci. (*Id.*). Similarly, Ms. Black complained that Plaintiffs were continuing to harass and threaten her. (*Id.* ¶ 59).

On April 11, 2001, Dr. Barkin called a staff meeting to address openly the simmering feud between Plaintiffs and Ms. Black because it was continuing to negatively affect the workplace. (Def's. 56.1 Statement ¶¶ 64, 68–69). Without naming them, Dr. Barkin instructed staff members to avoid interfering with personal issues of co-workers and spreading gossip. (*Id.* ¶ 64). As a result of the meeting, several employees informed Dr. Barkin and other staff members about their belief that the dispute between Plaintiffs and Ms. Black could become violent. (*Id.* ¶ 65). Dr. Barkin encouraged employees to report any violation of the policies he had discussed. (*Id.*)

Defendant's effort to resolve the dispute between Plaintiffs and Ms. Black produced short-term results. (Def's. 56.1 Statement ¶ 66). Between the meeting called by Dr. Barkin on April 11, 2001 and through May 6, 2001, there were no reported incidents or complaints. This limited "peace" was broken on May 7, 2001, when Gregory reported that Ms. Black had damaged his car in the School's parking lot. (*Id.* ¶ 67).

On May 8, 2001, before the School had the opportunity to investigate Gregory's complaint submitted a day earlier, a fight broke out between Plaintiffs, on the one hand, and Ms. Black and Ms. Daniel, on the other hand, in Defendant's parking lot as employees were leaving work. (Def's. 56.1 Statement ¶ 71). According to written statements submitted by co-workers,

the parties exchanged obscenities and threats, and threw punches before they could be separated. (Barkin Decl. Exh. D). Following the fight, Plaintiffs and Ms. Black were suspended pending an investigation. (Def's. 56.1 Statement ¶ 72).

Dr. Barkin conducted the investigation and interviewed twenty-one employees in addition to Plaintiffs and Ms. Black. (Def's. 56.1 Statement ¶ 73). All of the eyewitnesses stated that Plaintiffs had instigated the fight by shouting obscenities at and threatening Ms. Black, for example, by calling her a "welfare bitch" and stating "I want to kick her ass." (Id. ¶¶ 78–79).

Gregory submitted a letter, dated May 9, 2001, one day after the fight, in which he complained of discrimination as follows: Nekeya Black has "demonstrated and participated in these acts of discrimination numerous times, calling my wife racial slurs; stating to her that she was involved with me sexually and romantically, and stating reasons of her owns [sic] why me [sic] and my wife should not be together." (Kiley Decl. Exh. L).

On May 25, 2001, after completing his investigation, Dr. Barkin informed Plaintiffs and Ms. Black that he was terminating their employment for misconduct.[7] (Def's. 56.1 Statement ¶ 89). Dr. Barkin's decision was based on the parties' involvement in the May 8, 2001 fight and their continued violation of the School's directives that they stop bringing their personal disputes into the workplace. (Id. ¶ 88).

According to the complaints they filed in this case, Plaintiffs satisfied the necessary prerequisites to filing their lawsuits in this Court pursuant to Title VII. (Kiley Decl. Exhs. A & B). By prior order of this Court, Maria's and Gregory's cases were consolidated for purposes of discovery and decision on this motion.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81, 87 (2d Cir.1998) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998). Instead, the opposing party "must designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. 2548. A genuine factual issue exists if there is sufficient evidence favoring the opposing party for a jury to return a verdict in its favor. Anderson, 477 U.S. at 249, 106 S.Ct. 2505.

While this Court must be cautious about granting summary judgment in a discrimi-

---

7. Dr. Barkin suspended Ms. Daniel for two weeks as a result of her participation in the May 8, 2001 fight. (Def's. 56.1 Statement ¶ 90).

nation case because the employer's intent is often at issue "and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination," *see Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999), the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). "[T]he salutary purposes of summary judgment— avoiding protracted, expensive and harassing trials—[therefore] apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* (citation omitted).

### B. Admissibility of Documents Attached to Plaintiffs' Counsel's Affirmation

■ Initially, Defendant argues that the Court should not consider the documents attached to Plaintiffs' counsel's (Mr. Schaffer's) affirmation because they are presented by a witness with no personal knowledge of them. A touchstone for the admissibility of documents on a summary judgment motion is personal knowledge such that the "affiant is competent to testify to the matters stated therein." Fed. R.Civ.P. 56(e). With the exception of Plaintiffs' deposition transcripts, there is nothing in Mr. Schaffer's affirmation which reflects that he has any personal knowledge of the documents he seeks to introduce into evidence. *See generally Commercial Data Servers, Inc. v. International Business Machines Corp.,* 262 F.Supp.2d 50, 59 (S.D.N.Y.2003). Therefore, the Court is precluded from considering these documents.[8] *See, e.g., H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (documents submitted in opposition to summary judgment motion

must be presented by an affiant with personal knowledge and must be authenticated to be admissible).

### C. Race Discrimination Claims of Maria Stepheny

■ The Court next addresses Maria Stepheny's claims of race discrimination. Since identical standards apply to employment discrimination claims brought under Title VII, Section 1981, the Executive Law and the Administrative Code, the Court will analyze Maria's claims in light of Title VII jurisprudence. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 & n. 1 (2d Cir.2000); *see also Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) ("[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981").

· Maria alleges that she was denied "equal terms and conditions of employment" and terminated because of her "White color." (Kiley Decl. Exh. A, attaching Maria's complaint ¶ 15). In the context of a summary judgment motion, the Court must analyze her claims in accordance with the *McDonnell Douglas* burden-shifting paradigm. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Plaintiff has the burden at the outset of "proving by the preponderance of the evidence a *prima facie* case of discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case of discriminatory discharge, Maria must show that (1) she belongs to a protected class; (2) she was performing her duties satisfactori-

---

**8.** The challenged documents are attached as exhibits C–U to the affirmation of Brian Schaffer ("Schaffer Aff") executed on October 29, 2004.

ly; (3) she was discharged; and (4) her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004). The Court recognizes that the evidence necessary to satisfy this initial burden is *de minimis. Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001).

■ There is no dispute that Maria satisfies elements one through three of her *prima facie* case—she is white,[9] she was performing her job duties as a group leader satisfactorily, and the School terminated her. Defendant contends that Plaintiff has not offered any admissible evidence to satisfy the fourth element, namely that she was terminated under circumstances giving rise to an inference of discrimination based on race. Maria claims that she has satisfied this burden based solely on the fact that "Ms. Black's treatment of [her] was racially motivated." (Pls. Br. at 16). The Court disagrees.

■ The first way by which an employee may raise this inference is through evidence of discriminatory statements, but only "when a plaintiff demonstrates that a nexus exists between" them "and a defendant's [adverse employment] decision." *Schreiber v. Worldco, LLC*, 324 F.Supp.2d 512, 518 (S.D.N.Y.2004). Maria has failed to make such a showing. The only "racial" comments she alleges were made after December 2000, after Gregory ended his relationship with Ms. Black. However, these comments, were not made by anyone associated with the decision to terminate Maria. Rather, they were made by Ms. Black, who was terminated on the same day as Maria. Plaintiff has therefore not proffered any evidence that the person who made the "discriminatory" statements was involved in any way with Defendant's decision to terminate Maria, which she acknowledges was made by Dr. Barkin. (Maria Dep. at 207–10).[10] *See also Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984) ("Stray remarks by non-decision-

9. Courts in this Circuit have disagreed whether a plaintiff, as Maria here, faces a heightened burden in establishing a *prima facie* case of "reverse discrimination." *Compare e.g., Olenick v. New York Tel./A NYNEX Co.*, 881 F.Supp. 113, 114 (S.D.N.Y.1995) (holding that a non-minority plaintiff must show "background circumstances" that supports the suspicion that the "defendant is that unusual employer who discriminates against the majority") *with e.g., Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 640–41 (S.D.N.Y. 1998) (rejecting *Olenick* ). Although the Second Circuit has yet to definitively resolve this issue, it "has applied the same burden-shifting to claims of 'regular' discrimination—*i.e.*, where the plaintiff is a member of a historically disfavored group—as well as to claims of reverse discrimination—*i.e.*, where the plaintiff is not a member of a historically disfavored group." *Vallone v. Lori's Natural Food Center, Inc.*, 1999 WL 1012668, at *1 (2d Cir. Oct.12, 1999) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 310, 311–12 (2d Cir.1997)) (applying burden-shifting analysis to claim by male of Eastern European descent that defendant university had denied him job because of "its overarching desire to appoint women and minorities to its faculty"). More significantly, the Supreme Court has held that Title VII prohibits racial discrimination against whites on the same terms as racial discrimination against non-whites. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Notably, the court in *Olenick* did not cite to or attempt to distinguish the Supreme Court's holding in *McDonald.* In light of *McDonald*, and in the absence of contrary authority from the Second Circuit, the Court holds that the standard of proof for a plaintiff to establish a *prima facie* case of reverse employment discrimination is the same in all cases.

10. Other than her termination, and being subjected to a racially hostile work environment, *see* discussion *supra*, Maria does not suggest that she suffered any other adverse employment action as a result of the "discrimination" to which she was subjected.

makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision").

■■■ Plaintiff may also raise an inference of racial discrimination by proffering evidence that similarly situated employees were treated more favorably. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997). An inference of discrimination may be established by a showing of disparate treatment—that is, a showing that "the employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir.2003) (internal quotations omitted). "Although the ultimate burden in making a prima facie case is slight, the issue of whether fellow employees are similarly situated is somewhat strict." *Lanzo v. City of New York*, 2000 WL 804628, at *6 (E.D.N.Y. May 18, 2000) (Glasser, J.). "Similarly situated" means the other employee "must have engaged in conduct similar to the plaintiff's without such differentiating or · mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Id.* (internal citation and quotation omitted).[11] Maria has offered no evidence whatsoever that someone outside her protected group, for example, an African–American, was treated more favorably than she was under

similar circumstances. To the contrary, the record reflects that Defendant terminated both her and her husband, the latter being the only person according to Maria who is similarly situated to her, following the May 8, 2001 fight, in addition to Ms. Black. Similarly, she has also not come forward with any evidence that following her termination she was replaced by someone outside the protected class, which would satisfy a *prima facie* case of discrimination.

■■■ Assuming, *arguendo*, that Maria has established a *prima facie* case of discrimination, the burden shifts to Defendant to offer a legitimate, non-discriminatory rationale for its decision. *See, e.g., Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). This burden is merely "one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097. The employer's explanation of its reasons for the termination must, nonetheless, be "clear and specific." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Defendant has submitted indisputable evidence that it terminated Maria because she participated in the May 8, 2001 fight in the School's parking lot and repeatedly failed to abide by management's directive that she not bring personal issues into the workplace.[12] (Barkin Decl. ¶ 29). In this respect, while Maria characterizes herself

---

**11.** "There must be a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Soliman v. Deutsche Bank AG*, 2004 WL 1124689, at *9 (S.D.N.Y. May 20, 2004). The standard for a "similarly situated employee" requires "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000).

**12.** As a threshold matter, Maria ·claims that collateral estoppel precludes the Court from

considering Defendant's argument that she was terminated for, among other reasons, her participation in the May 8, 2001 fight, because an .administrative law judge ("ALJ") ruled on this issue in a hearing to reconsider the denial of her unemployment law benefits. Maria's position is flawed. The Court notes that evidence of Maria's application for unemployment law benefits, and the adjudication of her appeal, *see* Schaffer Aff. Exh. T, is inadmissible because the underlying documents have not been properly authenticated. *See infra* Point B. Even if it were admissible, the issue which Maria presented before the ALJ is

as an innocent victim of Ms. Black's aggressive and threatening behavior, the undisputed facts reveal that all of the eyewitnesses to the May 8, 2001 fight (except, of course, Maria and Gregory), noted that Plaintiffs were the aggressors. (*Id.* Exh. D). In addition, it is undisputed that Ms. Black filed repeated complaints against her for her threatening and harassing conduct.

Once the employer has articulated non-discriminatory reasons for the Plaintiff's termination, the burden shifts back to her to proffer admissible evidence to show pretext, "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold*, 366 F.3d at 152 (citations and internal quotation omitted). Maria claims she satisfied her burden because Defendant's proffered reason for her termination was "false." (Pls. Br. at 17, citing Schaffer Exh. A). As set forth above, the document on which Maria relies is not only inadmissible, it also does not say what Maria says it does. The "termination form" does not indicate the reasons for Maria's termination, but only explains that the "final incident" leading to her termination was her "giving [a] false statement to [her] supervisor." Since there is no evidence that Defendant's reasons for Maria's termination are pretextual, her claims for race discrimination are dismissed.[13]

## D. Plaintiffs' Hostile Work Environment Claims

Plaintiffs assert claims for hostile work environment, with Maria's claim predicated on race and Gregory's claim predicated on sex.[14] Title VII states: "It shall be an unlawful employment practice for an employer (1) to ... discriminate

---

not identical to the issue presented in this case. The ALJ considered the limited issue whether Maria was entitled to unemployment law benefits based on her alleged "misconduct in connection" with her employment. Schaffer Aff. Exh. T. At the hearing, Defendant did not send a representative or submit any evidence. In contrast, the issue which Maria presents in this case is whether, *inter alia*, Defendant discriminated against her on the basis of her race when it terminated her employment. Defendant has presented evidence supporting its position in this case that it did not. The collateral estoppel doctrine is thus inapposite. *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 256–57 (E.D.N.Y.1999) (administrative law judge's decision in unemployment compensation case, that first grade teacher had good cause to leave position as teacher in parochial elementary school, did not have collateral estoppel effect in teacher's breach of contract suit alleging that school failed to afford her additional year of employment required under contract because the issues were different) (Glasser, J.), *aff'd*, 201 F.3d 432 (2d Cir.1999). The same argument that Maria advances has been rejected in numerous decisions from this Circuit, which the Court finds persuasive.

*See, e.g., Gore v. R.H. Macy & Co.*, 1989 WL 65561, at *3 (S.D.N.Y. June 13, 1989) (ALJ's finding that plaintiff was not guilty of misconduct for unemployment insurance purposes was not entitled to preclusive effect in employment discrimination case, because issues were not identical and defendant did not have full and fair opportunity to litigate, since defendant's incentive to litigate unemployment claim was "minuscule" compared to the liability it faced in the discrimination action); *Wilson v. Supreme Color Card, Inc.*, 1988 WL 61914, at *2 (S.D.N.Y. June 6, 1988) (refusing to give preclusive effect in employment discrimination action to ALJ's factual findings in unemployment insurance proceeding, since in that proceeding, "it was [plaintiff's] conduct, rather than [defendant's], that was being judged").

13. Plaintiffs' counsel conceded at oral argument that his clients have not presented evidence showing that Defendant's decision to terminate them was pretextual.

14. Other than presenting evidence for his claim of a hostile work environment, Gregory has failed to proffer any evidence to support a garden variety claim of sex discrimination.

against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... race [or] ... sex." 42 U.S.C. § 2000e–2(a); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... race [or] ... sex' "). Title VII prohibits workplace harassment that is so severe and pervasive as to alter Plaintiffs' conditions of employment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). "To prevail on a claim of sexual [or racial] harassment based on a hostile work environment, a plaintiff must establish two elements: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atlantic,* 385 F.3d 210, 220 (2d Cir.2004) (internal quotations and citation omitted). The harassment must be both objectively and subjectively objectionable. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Factors relevant to the analysis include the frequency of the conduct, its severity, whether it was physically threatening, and whether it interfered with the employee's work performance. *Id.* Only when a workplace is "permeated with discriminatory intimidation" will harassment rise to a level actionable under Title VII. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996).

### 1. Was The Harassment Based on Plaintiffs' Gender or Race

As a threshold matter, Defendant argues that the alleged harassment against Maria and Gregory did not occur on account of either their race or sex. In support of its argument, Defendant cites to *Succar v. Dade County Board,* 229 F.3d 1343 (11th Cir.2000). In *Succar,* the plaintiff had a consensual sexual relationship with a co-worker that was terminated after the defendant made threats toward the plaintiff's wife and son. *Id.* at 1344. The defendant then verbally and physically harassed the plaintiff in the workplace, in front of colleagues and students. *Id.* The court dismissed the claim, finding that the plaintiff's sex was not the underlying reason for the harassment; instead, the harassment was motivated by the defendant's anger toward the plaintiff following their failed relationship. *Id.* at 1345. The court explained that "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination.... The plaintiff cannot turn a personal feud into a sex discrimination case." *Id.* (citation and internal quotation omitted). *See also DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304, 307–08 (2d Cir.1986) (decision by manager to create position for which only his girlfriend would be qualified is not "sex" discrimination because preference was not based on the gender of the employee but the supervisor's personal relationship with her), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987); *but see Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1188–89 (11th Cir.2001) (as part of his reaction to the plaintiff's decision to break off a sexual relationship, the alleged harasser solicited her at work to reinstate their intimate relationship and several times brushed up against her in an inappropriate way at work, which was sufficient to allow a jury to conclude that the plaintiff had an objective belief that she was the victim of harassment based on her gender). This

analysis applies equally to claims of race discrimination.

These cases reveal a dichotomy in situations where a failed relationship occurs in the workplace between harassment based on gender or race and harassment based on factors other than gender or race. If the jilted lover seeks retribution through actions that are not gender— or race-based, Title VII is not implicated. If the conduct is gender— or race-based, it is. This conclusion is corroborated by the Supreme Court's holding in *Oncale* that same-sex sexual harassment is actionable under Title VII. The Supreme Court held that the pertinent question is whether the harassment occurred because of an individual's sex as male or female. *Oncale*, 523 U.S. at 80, 118 S.Ct. 998. Notably, in *Oncale*, the Supreme Court stated that "[w]e have never held that workplace harassment, even harassment between men and women is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citation and internal quotations omitted). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex.'" *Id.*

Even when the Court construes their allegations in the light most favorable to them, Plaintiffs have failed to present any evidence which suggests that Ms. Black's "harassment" was motivated by either race or gender. Rather, all of the evidence compels the conclusion that it was driven by her frustrated amorous tryst with Gregory. Conduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of sex or race.

First, with respect to Maria's claim, she testified that prior to the time when Gregory ended his affair with Ms. Black, she does not recall that Ms. Black had ever cursed at her, or used the phrase "white bitch." (Maria Dep. at 113). She did so only after Gregory terminated his relationship with Ms. Black and started to ignore her, and Maria told Ms. Black that she knew about the affair. (*Id.* at 120). Ms. Black's use of the phrase "white bitch" was in connection with a pattern of "threats" and other comments which Ms. Black directed at Maria which were clearly not race-based, including "you think you're a big shot, group leader, they say you don't even know the paperwork"; "you stink (in a private area of body)"; "you will be gone soon"; "ugly bitch"; "I heard you are going to be fired soon"; and "I know where you live." (*Id.*) Therefore, Maria has failed to proffer evidence showing a link between the "harassment" and her race.

Second, Gregory corroborated his wife's testimony that Ms. Black's alleged harassment occurred as a result of the failed relationship. (Gregory Dep. at 83). He testified as follows:

Q: When you say it was really on your wife, it's your testimony that Nekyea [sic] Black made your wife's life miserable; is that correct?

A: She was making my life miserable, too, but indirectly by make [sic] statements that I was taking care of her kids, I was giving her money and that I was in a hotel with her, they came and said this to me, they were make [sic] my wife miserable because she was hearing this.

Q: Do you know why Nekyea [sic] Black was doing this?

A: Because she didn't want to break off the relationship, more or less. This is all I can say.

Q: It's your testimony that you believe she did it because she wanted to continue to have a relationship with you?

A: Yes.

(Gregory Dep. at 109).

The undisputed testimony therefore reveals that Ms. Black's alleged "harassment" was not based on Gregory's gender, or his wife's race.

Further, according to Gregory, Ms. Black told work colleagues about their relationship, which constituted the "sexual" harassment about which he complains: "my group was coming back to me, stating I had sex with her, that I went to the hotel, that I was giving her gifts, that I gave her a certain amount of money which I did but that was between me and her, it was $40, and they hit it on the nose. She went crazy over the $40, she was telling everybody that I gave her money." Even assuming that Ms. Black communicated this information to Plaintiffs' co-workers, on its face, this relates only to a recitation of Gregory's affair with Ms. Black, and was factually true. (Gregory Dep. at 90). The fact that the word "sex" was used by a co-worker is of no consequence. *See, e.g., Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) (plaintiff repeatedly called "sick bitch" by one of her male co-workers over a period of four years does not give rise to Title VII claim where "[t]he repetition of the term ... reflected and exacerbated a personal animosity arising out of the failed relationship"); *Benjamin v. Metropolitan School Dist. Of Lawrence Township*, 2002 WL 977661, at *3 (S.D.Ind. Mar.27, 2002) ("The use of terms that have some sexual connotation does not necessarily show that there is discrimination based on the plaintiff's sex").

Against this background, Plaintiffs have utterly failed to proffer admissible evidence that the alleged harassment occurred on account of either their race or sex.

**2. Whether the Conduct Was Severe or Pervasive**

■ Even if the Court did not find Plaintiffs' hostile work environment claims deficient because they were not based on their sex or race, Ms. Black's conduct cannot be characterized as sufficiently "severe" or "pervasive." Maria predicates her racially hostile work environment claim on Ms. Black's utterance of "white bitch" or some variation thereof to her five times over an approximately five month period. When viewed in the context in which these statements were made, Maria's hostile environment claim fails as a matter of law. *See, e.g., de la Concha v. Fordham Univ.*, 5 F.Supp.2d 188, 190 (S.D.N.Y.1998) (finding racially offensive comments, including the word "spic," by plaintiff's supervisor over four or five month period, insufficient to withstand summary judgment), *aff'd*, 173 F.3d 843 (2d Cir.1999); *Bolden v. New York City Housing Auth.*, 1997 WL 666236, at *2 (S.D.N.Y. Oct.27, 1997) (finding five offensive racial references by plaintiff's supervisor, including use of the epithet "nigger," made over a period of six weeks insufficient as a matter of law to establish hostile environment claim).

■ Similarly, Gregory's claim that his work environment was hostile sexually is unsupported. The fact that Ms. Black may have told co-workers about certain details of their relationship, including the fact that Gregory paid Ms. Black $40, and that they had sex in a motel room, is insufficient evidence to support such a claim. This is particularly so because Gregory does not dispute the statements

made about his affair. *See Carter v. Caring for the Homeless of Peekskill*, 821 F.Supp. 225, 230 (S.D.N.Y.1993) ("Even if it could be shown that it had become difficult or embarrassing for Dr. Foy and Mr. Carter to work together after the end of what can only be characterized as a turbulent love affair[ ] that simply is not enough to make out a case under Title VII"); *cf. Huffman v. City of Prairie Village*, 980 F.Supp. 1192, 1197–98 (D.Kan.1997) (female police dispatcher's claim that false allegations of rumors of a sexual relationship with a male sergeant had resulted in a hostile work environment were not based on her sex since the offensive comments and rumors were directed at both, and no corresponding undermining of her position or competence). Therefore, Plaintiffs' allegations do not depict a "severe" or "pervasive" environment of harassment.

### 3. Whether the Alleged Harassment Interfered With Plaintiffs' Job Performance

 Plaintiffs' claims of a hostile work environment fail for an altogether different and independent reason. They have proffered no evidence that the alleged harassment "interfered with ... [their] job performance, a *sine qua non* of such a claim," notwithstanding that certain of Ms. Black's comments may have been offensive. *See, e.g., Forde v. IBM Corp.*, 2003 WL 740220, at *4 (S.D.N.Y. Mar.4, 2003) (citing *e.g., Harris*, 510 U.S. at 21, 114 S.Ct. 367). In fact, in Gregory's written complaint of "harassment" dated May 9, 2001, he does not allege that Ms. Black's conduct interfered with his job performance in any way. (Kiley Aff. Exh. L). Maria's written complaints do not indicate that Ms. Black's "harassment" impacted her job performance. For example, in her May 8, 2001 memo to Ms. Geraci, Maria stated that she comes to work "regularly every day to work and do my best for our guys. Others have different intentions." (*Id.* Exh. J).

Further, in an undated memorandum which Maria wrote on or after March 23, 2001, she said: "I have been and will continue to perform my duties to run my group room. My consumers are my responsibility and top priority, and will always receive the best services they are entitled to." (Kiley Aff. Exh. H). With respect to the impact, if any, that Ms. Black's conduct was having on Maria, she wrote only that "it is difficult to have someone threat[en] and harass me during my work day." (*Id.*) Plaintiffs have thus failed to raise a genuine issue of fact whether the alleged harassment interfered with their job performance.

### 4. Was the School's Response to the Alleged Harassment Effective and Remedial

 Even assuming that Plaintiffs demonstrated a material issue of fact on the issues whether they were subjected to harassment based on their gender and/or race, whether it was severe or pervasive, and whether it affected their job performance, the Court finds that they have failed to create a material issue of fact on the issue whether Defendant failed to take effective and remedial action in response to their complaints. An employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it. *See Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995) (hostile work environment); *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986) (hostile racial environment). Since this is not a case of supervisory harassment, in that Plaintiffs and Ms. Black were co-workers, "the employer will be liable only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 441 (2d

Cir.1999). Here, the School had an anti-discrimination policy and complaint procedure, which Plaintiffs utilized. Under applicable law, therefore, even if the School had knowledge of the hostile work environment, liability will not attach unless it failed to take reasonable steps to eliminate the harassment.

■■■ The undisputed evidence in this case reveals that after Maria complained repeatedly about Ms. Black's conduct, the School transferred her from Maria's group. When the behavior between Plaintiffs and Maria relating to the affair did not cease, Ms. Geraci met with the parties to instruct them not to bring their personal disputes to the workplace. Further, Dr. Barkin, then the director of operations, convened meetings with them in an effort to resolve their dispute, and also convened a discussion with all employees. The proffered evidence therefore reveals that Defendant took prompt and remedial action in response to the complaints filed by the parties. While Plaintiffs argue that Ms. Black should have been terminated prior to May 8, 2001, or transferred out of the building where they worked together, the law does not require such a result. *See Gonzalez v. Beth Israel Med. Ctr.*, 262 F.Supp.2d 342, 355 (S.D.N.Y.2003) (plaintiffs are not entitled to choose the remedy to end the harassment). "An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be sufficiently calculated to end the harassment." *Id.* (citation and internal quotation omitted).

The essence of Plaintiffs' claims is that Defendant was at fault in not immediately terminating the players in the lover's triangle, particularly Ms. Black, rather than attempting to amicably resolve their embittered relationship and thus save their jobs. Their claims make neither good sense nor good law. The Court thus concludes that there is no genuine issue of fact whether Defendant responded promptly and effectively to Plaintiffs' complaints.

## E. Retaliation Claim

■■■ The *McDonnell Douglas* burden shifting analysis for employment discrimination cases applies to Plaintiffs' retaliation claims under Title VII. *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 94 (2d Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001). First, Plaintiffs must establish a *prima facie* case of retaliation by showing that (1) they were engaged in a protected activity under Title VII; (2) the employer was aware of Plaintiffs' participation in the protected activity; (3) Plaintiffs were subjected to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse employment action. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997) (citations omitted). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Slattery*, 248 F.3d at 94. If the Defendant meets this burden, Plaintiffs have the opportunity to prove that the proffered reasons are a pretext for retaliatory action. *Id.*

■■■ It is undisputed that Plaintiffs satisfied elements two and four of their *prima facie* case of retaliation. However, the Court finds that they have not raised a material issue of fact with respect to elements one and three. First, with respect to protected behavior, although Maria may have complained about certain comments and threats directed towards her by Ms. Black, she has failed to present evidence that her "complaint" was based on her belief that she was being discriminated against (or harassed) on account of her race. Rather, as set forth above, the un-

disputed evidence demonstrates that Maria (and Gregory) believed that Ms. Black's conduct arose out of her failed relationship with Gregory. Similarly, Gregory's May 9, 2001 "complaint" of "harassment" focused solely on Ms. Black's behavior which was directed against him because of the failed relationship, and not because of Gregory's gender. (Kiley Aff. Exh. K). Indeed, Gregory did not use the terms "race" or "sex" in his "complaint." (*Id.*).

■ Second, other than a temporal nexus, Plaintiffs have not proffered any evidence linking their purported "complaints" to the School's decision to terminate them. While it is, of course, true that temporal proximity can demonstrate a causal nexus, *see Manoharan v. Columbia Univ.*, 842 F.2d 590, 593 (2d Cir.1988), the event that immediately preceded Plaintiffs' termination was their involvement in the May 8, 2001 fight. Therefore, even viewing the evidence in the light most favorable to Plaintiffs, "temporal proximity, without more, does not satisfy the causal nexus necessary for a retaliation." *Trigg v. New York City Transit Auth.*, 2001 WL 868336, at *11 (E.D.N.Y. July 26, 2001) (Glasser, J.), *aff'd*, 50 Fed.Appx. 458, 171 L.R.R.M. (BNA) 3280 (2d Cir.2002).

Further, as set forth above with respect to the discussion regarding Maria's claim for race discrimination, Defendant has presented legitimate, non-discriminatory reasons for Plaintiffs' termination. Plaintiffs have also failed to proffer any evidence to raise a material issue of fact that the reasons given by Defendant for Plaintiffs' termination were untrue or a pretext for discrimination.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

The Clerk of Court is respectfully directed to close these cases.

SO ORDERED.