**Nohemi FIGUEROA and Maria Guimaraes Plaintiffs,**

v.

**NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, District Council 37, and Local 1180 Communications Workers of America Defendants.**

**No. 03 Civ. 9589(NRB).**

United States District Court, S.D. New York.

March 27, 2007.

226

Alex Ali Ayazi, Assistant Corporation Counsel, City of New York, New York City, for Defendant NYC Health and Hospitals Corp.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Nohemi Figueroa[1] ("plaintiff"), a former employee of the New York City Health and Hospitals Corporation ("HHC" or "defendant"), brought this employment discrimination under: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; (2) the New York City Human Rights Law ("CHRL"), New York City Administrative Code §§ 8–101, *et seq.*; and the New York State Human Rights Law ("SHRL"), New York Executive Law §§ 290, *et seq.* Plaintiff, a Puerto Rican woman, alleges that the HHC discriminated against her on the basis of her national origin and gender.[2] Defendant HHC now moves for summary judgment as against plaintiff Figueroa, for three reasons. HHC asserts that: (1) the treatment Figueroa complains of does not constitute adverse employment action, and thus she cannot establish a prima facie case of discrimination; (2) the alleged actions did not occur under circumstances which give rise to an inference of discrimination based on national origin or gender; and (3) HHC had legitimate business rea-

Perry S. Friedman, New York City, for Plaintiff.

1. Plaintiff Maria Guimaraes' claims did not proceed in the same track because of an earlier illness.

2. Although initially plaintiff alleged harassment and retaliation in contravention of anti-discrimination laws, plaintiff's counsel explicitly abandoned his client's retaliation claims at oral argument. *See* Transcript of Oral Argument, dated Feb. 22, 2007 ("Tr.") at 5–7. Further, although counsel made reference at the end of the oral argument to plaintiff's claim of hostile work environment, *see* Tr. at 41, this claim does not warrant discussion separate and apart from plaintiff's claims of intentional discrimination. Not only did plaintiff fail to distinguish the harassment claim from the discrimination claim at oral argument, *see id.*, but further, given plaintiff's inability to establish a discriminatory animus in the intentional discrimination claim, she can have no greater success in the harassment context. Thus, we focus our inquiry here on plaintiff's intentional discrimination claim.

sons for the actions it took with respect to plaintiff. For the reasons set forth below, defendant's motion is granted in all respects.

## BACKGROUND [3]

Plaintiff Nohemi Figueroa ("plaintiff" or "Figueroa"), a woman who identifies herself as being of Puerto Rican descent, was first employed with Lincoln Medical and Mental Health Center Nutritional Services Department ("Lincoln") as a part time Dietary Aide in January of 1996. Defendant New York City Health and Hospitals Corporation's Local Rule 56.1 Statement of Undisputed Facts With Respect to Claims of Plaintiff Figueroa ("Def. 56.1 Stmt.") ¶ 1. On January 18, 2001, plaintiff was promoted to the position of Full–Time Dietary Aide. Defendant's Exhibit ("Def.Ex.") B (Personnel Requisition Form signed by Berdie Muirhead, Director of Food services at Lincoln (Jan. 18.2001)). The incidents at issue in this case occurred after plaintiff's promotion. We will first discuss the relevant law at issue here, before turning to the alleged discriminatory incidents in turn. We note at the outset that since the analysis used in Title VII claims parallels that applied by courts in evaluating claims brought under New York State and City human rights laws, we shall structure our discussion around the Title VII claims brought by plaintiff. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000) (citing *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir.1999) (applying New York state law); *Landwehr v. Grey Advertising, Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995) (applying New York City law)).

## I. Standard for Summary Judgment

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Even if parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pacific Bancorp. v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir.2004) (internal citations and quotation marks omitted). In addition, once the moving party has made a sufficient showing, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998)).

The Second Circuit has stated that district courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial

---

**3.** Except where indicated, there are no genuine issues regarding the following facts.

proof which, if believed, would show discrimination.' " *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994)). However, summary judgment in an employment discrimination case may still be appropriate if the plaintiff relies "on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. New York Presbyterian Hosp.,* No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003). This is because, as the Second Circuit has stated, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001).

## II. Intentional Discrimination under Title VII

### A. Applicable Law

The core provision of Title VII of the Civil Rights of Act of 1964 makes it an unlawful employment practice for employers:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify ... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). To avoid dismissal on a motion for summary judgment, a plaintiff must withstand the three part burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See McPherson v. New York City Department of Education,* 457 F.3d 211, 215 (2d Cir.2006). First, the plaintiff must establish a prima facie case by demonstrating: (1) that she is a member of a protected class; (2) that her job performance was satisfactory; (3) that she suffered from an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If the plaintiff can demonstrate a prima facie case, the burden then shifts to the defendant employer to provide a legitimate non-discriminatory reason for the adverse employment action. *Id.* If such a showing is made by the defendant, then the burden shifts back to the plaintiff to prove that discrimination indeed existed, for example, by showing that the employer's proffered reason is mere pretext. *Id.* However, it is important to note that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff. Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.

2006) (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000)).

■ Defendant, in its motions papers, concedes that plaintiff, a woman of Puerto Rican heritage, is a member of classes protected by Title VII. In addition, for the purpose of their motion, defendant assumes that plaintiff could meet the second prong of the prima facie case. With regard to the third prong, under Second Circuit law, an adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Demoret,* 451 F.3d at 151 (quoting *Fairbrother v. Morrison,* 412 F.3d 39, 56 (2d Cir.2005)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* In her complaint, plaintiff points to a variety of actions taken by her employer which she asserts constitute adverse employment actions. Defendant, in its motion, contests whether each of the actions are adverse employment actions, and whether the circumstances surrounding the actions give rise to an inference of discrimination.[4] *See* Memorandum of Law in Support of New York City Health and Hospitals Corporation's Motion for Summary Judgment with Respect to the Complaint of Plaintiff Figueroa ("Def.Mem.Supp.") at 4. Plaintiff has now narrowed her claims of adverse employment actions to two discrete incidents.[5] Thus, we will focus our inquiry to those alleged instances of adverse employment actions that the plaintiff chose to continue to pursue in light of defendant's motion: (1) the denial of plaintiff's first choice of vacation, and (2) the initial denial of plaintiff's sick leave benefits.

## B. Adverse Employment Action

### 1. Choice of Annual Leave

■ Plaintiff argues that her supervisors discriminated against her by denying plaintiff her first choice of when to take annual leave, and approving her second choice of annual leave in both 2001 and 2002. *See* Compl. ¶¶ 14–15. On February 8, 2001, plaintiff submitted her request for annual leave, indicating that her first choice was to take July 13, 2001 to July 30, 2001 off from work, and her second choice was to take leave from December 30, 2001 to January 14, 2002. Def. Ex. G (plaintiff's annual leave request for 2001). At Lincoln, staff availability and seniority of an employee are the main criteria taken into consideration in approving of annual leave requests. *See* Deposition of Berdie Muirhead (May 16, 2005) ("Muirhead Dep.") at 64. Although her first choice for annual leave in 2001 was initially denied due to concerns about staffing, and because plaintiff lacked seniority, *see id.* at 71, that decision was then reversed when it was determined there would be sufficient per-

---

**4.** Defendant concedes that plaintiff's termination from employment constitutes an adverse employment action, but asserts that there were legitimate business reasons for the termination. *See* Def. Mem. Supp. at 4.

**5.** We note that originally plaintiff pointed to a variety of actions which she claimed to be adverse employment actions, including differences in work assignments and schedule, dis-

ciplinary charges, and overtime differences. Plaintiff relied on her own deposition as the basis for these claims. However, after discovery revealed company records and deposition testimony which objectively refuted plaintiff's assertions of adverse employment action, plaintiff chose to abandon these other claims in her briefs and at oral argument. *See* Tr. at 5–6, 34.

sonnel to cover plaintiff's absence during the last two weeks in July. Consequently, plaintiff was able to take her vacation at that time.[6] Deposition of Nohemi Figueroa (May 9, 2005) ("Figueroa Dep.") (found as Def. Ex. H), at 102–103. On January 28, 2002, plaintiff submitted her annual leave request for the following year, she indicated that her first choice was July 15, 2002 to July 26, 2002, and the second choice was December 28, 2002 to January 6, 2003. *See* Def. Ex. J (plaintiff's first annual leave request for 2002). Ms. Muirhead denied plaintiff's first choice, but approved of her second choice. *Id.* Subsequent to the denial of plaintiff's first choice for annual leave in 2002, plaintiff met with her two supervisors responsible for approving of vacation, Ms. Muirhead and Mr. Earl Frazier, on March 13, 2002.[7] *See* Muirhead Dep. at 71–72; Figueroa Dep. at 27, 31–32. On June 11, 2002, plaintiff once again requested vacation from July 15, 2002 through July 29, 2002, which was again denied by Ms. Muirhead. *See* Def. Ex. L (plaintiff's second annual relief request for 2002); Muirhead Dep. at 71.

■ We find that plaintiff's treatment by her employers does not constitute an adverse employment action. Ms. Figueroa ultimately received her first choice for vacation time in 2001. With regard to the annual leave for 2002, "[t]he particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action." *Boyd v. Presbyterian Hospital,* 160 F.Supp.2d 522, 537 (S.D.N.Y.

2001). Plaintiff concedes that "standing alone, the constant denials of [plaintiff's] vacation ... would not rise to the level of an adverse employment." Memorandum of Law in Opposition to Defendant New York Health and Hospitals Corporation's Motion for Summary Judgment. ("Mem. Opp.") at 8. However, plaintiff argues that the denial of plaintiff's choice of vacation "is in fact directly connected to the subsequently denial of plaintiff's paid medical leave" and that the two actions in tandem constituted an adverse employment action. *See id.* Plaintiff cites no case law, and this Court is aware of none, which supports the proposition that we are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim, as plaintiff alleges here. *See Hill v. Rayboy–Brauestein,* 467 F.Supp.2d 336, 371 n. 22 (S.D.N.Y.2006) (similarly finding no support for the consideration of the cumulative impact of separate allegedly adverse actions to establish a prima facie case of intentional discrimination). Accordingly, since plaintiff was not barred from taking any annual leave during the two years in question, these events fail to constitute a sufficient showing to satisfy the third prong of for a prima facie case. We now turn to separately evaluate the plaintiff's second allegedly adverse employment action: the denial of her sick leave.

### 2. Denial of Sick Leave

As noted above, on March 13, 2002, after her first request for annual leave was de-

---

**6.** We acknowledge that plaintiff believes the decision not to grant her first choice for annual leave was reversed only upon the intervention of "Mr. Max," who we believe to be Max Lilavois, Network Senior Associate Director. It appears that Mr. Lilavois double checked the schedules and determined there would be adequate staffing at the end of July. *See* Figueroa Dep. at 102. However, we find the circumstances behind how the reversal occurred to be immaterial to the question of whether there was an adverse employment action with regard to the 2001 annual leave determination, since ultimately plaintiff was allowed to take her first choice for vacation.

**7.** We note that the accounts of the three participants of this meeting are discussed below in greater detail, in the context of our examination of the denial of plaintiff's sick leave.

nied, plaintiff met with her two supervisors responsible for approving of vacation, Ms. Muirhead and Mr. Frazier. *See* Muirhead Dep. at 71–72; Figueroa Dep. at 27, 31–32. Plaintiff, in her deposition, stated that Mr. Frazier and Ms. Muirhead were "humiliating and intimidating" her during this meeting, screaming at her, and making pointed gestures. Figueroa Dep. at 34–35. According to plaintiff, Mr. Frazier stated to Ms. Figueroa that she was not going to get her first choice for vacation, and if she were to get sick and bring a doctor's note, she would be deducted for those sick days. *Id.* at 31–32. Further, plaintiff claims that at this meeting, Ms. Muirhead relayed to plaintiff that were it up to her, she would not have promoted plaintiff, and instead would have promoted Shirley Price or Lisa Skinner instead, because they were African–Americans. *See* Figueroa Dep. at 26–27, 35–36. Ms. Muirhead and Mr. Frazier, on the other hand, deny Ms. Figueroa's account of the meeting, describing the meeting as having been conducted professionally and without yelling. Muirhead Dep. at 72. According to them, Ms. Figueroa was informed that despite her being a good and faithful employee, she was denied her first choice based on seniority and availability of staff. Muirhead Dep. at 72; Deposition of Earl Frazier (May 19, 2005) ("Frazier Dep.") at 91. Further, Ms. Muirhead did not recall Mr. Frazier telling Ms. Figueroa that if she brought in a doctor's note to excuse her, she would be deducted for any time she claimed she was sick. Muirhead Dep. at 72.

Plaintiff alleges that two weeks later, on April 2, 2002, she fell as a result of using a cart to transport ice while on the job. As a result of this fall, plaintiff claims she sustained injuries to her lower back and neck. Figueroa Dep. at 64, 67. According to plaintiff, she then informed her direct supervisor Emelita Villanueva about the alleged accident, but continued to work

that despite her pain, because she feared any note from the doctor's office "was not going to be accepted" as a legitimate medical excuse for a leave of absence. *Id.* As mentioned above, on June 11, 2002, plaintiff again requested vacation from July 15, 2002 to July 29, 2002, and her request was again denied. On July 9, 2002, plaintiff presented a note from her doctor to Ms. Muirhead stating she should have absolute bedrest until August 1, 2002. *See* Muirhead Dep. at 91. Although plaintiff claims that the medical condition she suffered during this period were neck stiffness and pain which had started with her fall in early April, *see* Figueroa Dep. at 68, the doctor's note states that plaintiff was unable to work due to hyperthyroidism, migraines, and hyperlipidemia, and should have absolute bedrest until August 1, 2002. Def. Ex. M (note from plaintiff's doctor). Upon receipt of this documentation, Ms. Muirhead called plaintiff to her office. According to Ms. Muirhead, she informed plaintiff that although she was sorry plaintiff was feeling ill, Ms. Muirhead would have to call labor relations for advice as to whether to grant the request for sick leave, since the time requested coincided with the time plaintiff had previously asked to take as annual leave. Muirhead Dep. at 91. Subsequent to this conversation, Ms. Muirhead discussed the situation with Evetta Woollery–Johnson, the Associate Director of Network Human Resources and Labor Relations. *See* Deposition of Evetta Woollery–Johnson (Aug. 10, 2005) ("Woollery–Johnson Dep.") at 88. Ms. Woollery–Johnson advised Ms. Muirhead that in circumstances where an employee had been denied her desired choice for vacation time and has subsequently called in sick for that period, the department and Ms. Muirhead had the discretion as to whether she would pay the employee for

the sick time.[8] *Id.* After this conversation, plaintiff was denied sick leave and taken off the payroll on July 10, 2002.[9] *See* Def. Ex. O (plaintiff's "Verification of Employment" from the payroll department, noting that plaintiff last worked on July 7, 2002, and last day she was paid for work was July 9, 2002).

On July 11, 2002, plaintiff filed a grievance regarding the denial. *See* Def. Ex. P ("District Council 37 Hospitals Division Grievance Summary Worksheet," filled out by plaintiff). The next day, plaintiff filed a complaint with the HHC Inspector General, detailing her grievances with her treatment by Ms. Muirhead and Mr. Frazier, and accusing them of discriminating against individuals within the department, particularly those of Hispanic heritage whose English is limited. *See* Def. Ex. Q (Letter from Nohemi Figueroa to Luizette Corchado, Supervising Investigator, Office of Inspector General, New York City Health & Hospitals Corporation (July 12, 2002)). On July 29, 2002, plaintiff's union representative sent a letter to Ms. Muirhead requesting a meeting to discuss the denial of Ms. Figueroa's requested vacation, and Ms. Figueroa's problems with

Mr. Frazier and Ms. Muirhead. *See* Def. Ex. R. (Letter from Felicita R. Creque, Council Representative, DC 37, NYC Health & Hospitals Corp., Local 420, to Ms. Muirhead Berdie [sic] (July 29, 2002)). Evetta Woollery–Johnson responded to the union's letter by asking for a clarification. *See* Def. Ex. S (Letter from Evetta Woollery–Johnson to Felicitia [sic] Creque (Aug. 15, 2002)). Plaintiff's union responded to Ms. Woollery–Johnson with a letter requesting a labor management meeting regarding plaintiff's sick leave issue. *See* Def. Ex. T (Letter from Felicita R. Creque to Evetta Woollery–Johnson (Aug. 21, 2002)). In preparation for the labor management meeting, the plaintiff was scheduled to have a medical evaluation by a physician at Lincoln to assess her illness, *see* Def. Ex. U (Letter from Lincoln to Nohemi Figueroa (Sept. 24, 2002)), and a labor management meeting was scheduled for October 30, 2002. *See* Def. Ex. V (Memorandum from Evetta Woollery–Johnson to Berdie Muirhead (Oct. 1, 2002)). In the interim, plaintiff returned to work on October 21, 2002 and ceased work on October 24, 2002.[10] *See* Def. Ex.

8. Ms. Woollery–Johnson stated at her deposition that in her conversation with Ms. Muirhead, that she "believe[d Ms. Muirhead] made mention ... that similar events occurred the year before." Woollery–Johnson Dep. at 87. Further, Ms. Woollery–Johnson stated that "basically to the best of my recollection when [Ms. Muirhead] says the employee was told that the vacation was denied due to seniority, the employee called in sick and had been out sick prior to during and after and I believe her question was do I have right to grant it and I told her that the granting of time is at the department's discretion." *Id.* at 88. Plaintiff argues that this statement constitutes evidence that Ms. Muirhead made false representations about plaintiff having taken sick leave during her requested vacation time the year before, in 2001. *See* Mem. Opp. at 11. We find this to read too much into Ms. Woollery–Johnson's deposition. She qualified her

description of the conversation at issue by saying this was what she "believed" Ms. Muirhead had said, to the "best of [her] recollection." *Id.* Thus, we believe Ms. Woollery–Johnson's statement, which acknowledges her lack of a clear and specific recollection, does not necessarily suggest that Ms. Muirhead had in fact lied to her about plaintiff having previously taken sick leave.

9. As noted below, the record reveals that plaintiff was not working during this period of time, and only returned to work for at most a few days at the end of October, 2002. *See infra* note 10.

10. Defendant claims that plaintiff only returned to work for one day, October 24, 2002, and then never returned. *See* Def. 56.1 Stmt. ¶ 24. However, the document to which defendant refers to for this proposition reads:

O (plaintiff's "Verification of Employment" from the payroll department). On October 30, 2002, a labor relations meeting was held and the decision was made to pay plaintiff for all of her sick leave. Subsequent to this meeting, plaintiff was issued a series of paychecks that reflected payment for her accrued sick and annual leave.[11] *See* Figueroa Dep. at 133.

We acknowledge that, if plaintiff's account of the events at question is true, she was subject to less than desirable treatment by her supervisors, especially in light of the alleged behavior of Mr. Frazier and Ms. Muirhead in their March 2002 meeting with plaintiff. However, there is no dispute that plaintiff was ultimately paid for her requested, but initially denied, sick leave. Defendant asserts that since plaintiff ultimately did not lose any pay, the initial denial of her sick leave does not constitute an adverse employment action. In support of this proposition, defendant cites *Fairbrother v. Conn. Dept. Mental Health and Addiction Serv.*, 306 F.Supp.2d 154 (D.Conn.2003), *aff'd in relevant part Fairbrother v. Morrison*, 412 F.3d 39 (2d Cir.2005), where the court found there to be no adverse employment action when the initial denial of workers' compensation claim was ultimately reversed on further review, and *Trigg v. New York City Transit Authority*, 99 Civ. 4730(ILG), 2001 WL 868336, at *10 (E.D.N.Y. July 21, 2001), where the court concluded that a post-termination effort by a former employer to deny the employee unemployment benefits did not amount to an adverse employment action.

Relying on the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. v. White*, —— U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), which was rendered during the pendency of this motion, plaintiff argues that the initial denial of sick leave constitutes an adverse employment action due to her status as a single working mother and sole breadwinner in her family, and due to the fact that once plaintiff was reinstated on payroll, she received backpay in biweekly installments instead of a lump sum. *See* Memorandum of Law in Opposition to Defendant New York Health and Hospitals Corporation's Motion for Summary Judgment ("Pl.Mem.Opp.") at 7. In *Burlington Northern*, the Sixth Circuit en banc upheld a jury's finding that a 37–day suspension without pay amounted to retaliation in contravention of Title VII, despite the fact that internal grievance procedures led to plaintiff White being reinstated and awarded full backpay for those 37 days. *See* 126 S.Ct. at 2410. The Court granted certiorari in *Burlington Northern* to resolve a disagreement among the circuits as to whether a plaintiff's challenged action must be employment or workplace related and how harmful it must be to constitute retaliation as prohibited by Title VII. Some circuits, including the Second and Sixth Circuits, applied the same standard for both retaliation and substantive discrimination claims, requiring that the challenged action must result in an adverse effect on the terms, conditions, or

---

"EMPLOYEE WAS IN PAY STATUS UNTIL 7/2/02 / FROMT [sic] 7/10/02 TO 10/18/02 WAS WITHOUT PAY / RETUR [sic] TO WORKD [sic] ON 10/21/02 / BACK OUT ON 10/24/02 …" Def. Ex. O. Thus, it is possible that plaintiff worked for more than just October 24, 2002.

**11.** Despite the absence of documentation relaying the determination at the labor relations meeting, we note that plaintiff, in her deposition, stated that "[a]lthough no decision was issued to me, I had been receiving my paychecks from the time I had not been paid and for the time of my disability until my annual leave and other modes of pay ran out." Figueroa Dep. at 133. Given that plaintiff was paid in this capacity, we infer that the determination at the meeting was in plaintiff's favor.

benefits of employment. *Id.* at 2410. In contrast, other circuits used a broader definition in the context of retaliation, asking whether the employer's challenged action would have been material, even if not necessarily directly linked to the terms of employment, to a reasonable employee. *Id.* at 2410–11. Justice Breyer's majority opinion in *Burlington Northern,* joined by seven members of the Court, adopted the broader of these two interpretations, by concluding that "[t]he scope of the anti-retaliation provision extends beyond the workplace-related or employment-related retaliatory acts and harm." *Id.* at 2414. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation and citation omitted).

*Burlington Northern* bears upon the present case because it both rejected the Second Circuit's standard for retaliation cases [12] and because it affirmed the jury's finding that suspension without pay for 37 days was in any event a materially adverse change in the terms of the plaintiff's employment.[13] *Id.* at 2417–28. We believe there may be a material difference between the adverse action suffered by White in *Burlington Northern* and by plaintiff here, given that White was placed on involuntary leave and not allowed to return to work, whereas Ms. Figueroa, upon being denied sick leave, was not prohibited by her employer from returning to

work. Nevertheless, for the purposes of this motion, we shall assume that the initial denial of sick leave is sufficient to meet the third prong of a prima facie case. Thus, we now turn to the fourth prong: whether plaintiff has shown an inference of discrimination.

## C. Inference of Discrimination

Plaintiff, in her response to defendant's motion to dismiss, claims two discrete discriminatory inferences. First, plaintiff claims that she was subjected to sex discrimination by Mr. Frazier, who denied plaintiff's choice for vacation and plaintiff's request for paid medical leave so as to interfere with plaintiff's relationship with Mr. Luis Martinez, one of plaintiff's co-workers. *See* Mem. Opp. 8. Second, plaintiff claims she was subject to national origin discrimination when she was denied paid sick leave, as she was being punished by Ms. Muirhead for having been promoted to full time dietary aide instead of equally qualified African American part time aides. *See id.* at 10–11. We will examine both of these allegations as presented by plaintiff in turn.

### 1. Sex Discrimination Allegation

According to plaintiff, Mr. Martinez was a former lover of Mr. Frazier, who was jealous of plaintiff's relationship with Mr. Martinez. In at least one instance, another employee witnessed Mr. Frazier telling plaintiff that "he was going to take away her man." See Declaration of Perry S. Friedman (June 15, 2006) ("Friedman Decl."), Ex. 4 (Deposition of Brenda Har-

---

**12.** We note that the Second Circuit has acknowledged that its prior identical treatment of discriminatory actions under Title VII's substantive discrimination and retaliation provisions appears invalid in light of *Burlington Northern. See Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 207 (2d Cir.2006).

**13.** Even Justice Alito, who declined to join the majority, nevertheless concurred in judgment, concluding that White's suspension without pay fell within the definition of an "adverse employment action." *Id.* at 2421–22 (Alito, J., concurring).

ris (July 22, 2005) ("Harris Dep.")) at 42. Further, Mr. Martinez testified that when plaintiff's vacation request was denied, Mr. Frazier told Mr. Hernandez "[H]a ... Last year; the two of took vacation time together because Mr. Moss [14] [sic] approved your vacations. But this year, you're not going to have that privilege." *See* Friedman Decl., Ex. 5 (Deposition of Luis Martinez (Oct. 24, 2005) ("Martinez Dep.")) at 42. Thus, plaintiff alleges, Mr. Frazier "harassed and discriminated against [plaintiff]" by denying plaintiff's first choice of vacation two years in a row, and then denying paid medical leave because the dates requested coincided with those requested by Mr. Martinez. *See* Mem. Opp. 1–2, 8.

 Taking plaintiff's allegations as true, they do not establish that the treatment of plaintiff at the hands of Mr. Frazier constitute sex discrimination which is actionable under Title VII. The operative question here is whether the harassment occurred because of plaintiff's gender. As the Supreme Court stated in *Oncale v. Sundowner Offshore Services Inc.,* "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed ... Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged

with offensive sexual connotations, but actually constituted *'discrimina[tion]* ... because of ... sex.'" 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (emphasis in original) (citation omitted). In other words, as applied to this context, "[i]f the jilted lover seeks retribution through actions that are not gender- or race-based, Title VII is not implicated." [15] *Stepheny v. Brooklyn Hebrew School for Special Children,* 356 F.Supp.2d 248, 263 (E.D.N.Y. 2005).

 Here, plaintiff's sole assertion as to why Mr. Frazier's denial of her first vacation choice constitutes sex discrimination is that Mr. Martinez, a man with whom Mr. Frazier had previously had sexual relations, was not subject to any adverse action. Plaintiff reasons that since Mr. Martinez is a male and plaintiff is a female, this constitutes evidence of sex discrimination. *See* Mem. Opp. 9–10. However, the real question is whether plaintiff was treated as alleged because she was a female, as opposed to the fact that she was seeing Mr. Martinez. If, as plaintiff alleges, Mr. Frazier was jealous of the new relationship and wished to interfere with it, it is logical to conclude that Mr. Frazier would treat any employee who had a subsequent personal relationship with Mr. Martinez in the same manner, regardless of that employee's sex. Further, plaintiff cannot point to any evidence in the record which even suggests that Mr. Frazier

---

14. We believe this to be a transcript error, and that Mr. Martinez was referring to Max Lilavois, Network Senior Associate Director and supervisor of Mr. Frazier and Ms. Muirhead, whom employees referred to as "Mr. Max."

15. We acknowledge that both *Oncale* and *Stepheny* are sexual harassment cases, which are in some ways distinct from intentional sex discrimination cases. However, we find the rationale behind these cases to be equally applicable here, both because plaintiff relies

upon alleged harassment on the basis of sex at the hands of Mr. Frazier to establish an inference of discrimination, and also because both sexual harassment and intentional sex discrimination claims rely upon the same language found in Title VII. Thus, a plaintiff must establish that the cause of the differential treatment was his or her sex to prove either an intentional sex discrimination or a sexual harassment claim. *See Oncale,* 523 U.S. at 79, 118 S.Ct. 998.

treated plaintiff with greater disrespect because, in addition to having taken Mr. Martinez as a companion, she was female as opposed to male.

Accordingly, we do not believe that plaintiff has presented sufficient proof to infer sex discrimination on the part of Mr. Frazier.

### 2. National Origin Discrimination Allegation

Plaintiff also states that, at the March 13, 2002 meeting at which Ms. Muirhead allegedly warned plaintiff that she would suspend her without pay if she attempted to take sick leave, Ms. Muirhead informed plaintiff that if it had been up to her, she would have never been promoted and that she had wanted to promote Shirley Price or Lisa Skinner instead, because they were African–Americans. *See* Figueroa Dep. at 26–27. Ms. Muirhead testified that although others were eligible to be promoted to full-time, *see* Muirhead Dep. at 32, she had suggested that plaintiff be promoted, and that plaintiff was one of the "best workers in the department." *See id.* at 30. Max Lilivois stated in his deposition that neither Ms. Muirhead nor Mr. Frazier suggested to him that plaintiff be promoted. *See* Pl.Ex. 5 (Deposition of Max Lilavois (Sept. 20, 2005) ("Lilavois Dep.")) at 44. However, Mr. Lilavois did testify that, after plaintiff had approached him for consideration for the promotion, both he and Ms. Muirhead decided to promote plaintiff to a full time dietary aide, "together" and in collaboration. *Id.* at 35–36. Mr. Lilavois stated that he wanted Ms. Muirhead "to have input and to be involved" in the decision, as "that's her role" within the hospital. *Id.* at 36.

■ Defendant argues that in light of Ms. Muirhead's deposition testimony, the "same-actor inference" precludes any inference of discrimination. We agree. The "underlying rationale for the [same-actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Watt v. New York Botanical Garden,* No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000). Since plaintiff alleges discrimination at the hands of Ms. Muirhead, the same woman who approved of her promotion, the same-actor inference is applicable here. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). At best, plaintiff has raised a material dispute as to whether she or Ms. Muirhead had first suggested her promotion. However, since Ms. Muirhead and Mr. Lilavois jointly decided to promote her in lieu of other part time dietary aides, and ultimately plaintiff received the promotion, we cannot conclude that plaintiff could sustain an inference of national origin discrimination before a jury in light of the same actor inference.

### D. Legitimate Business Reason

■ Even if plaintiff could legitimately establish a prima facie case of discrimination, defendant has legitimate business reasons for having denied plaintiff her sick leave in this case. As noted above, plaintiff in 2002 requested to take vacation from July 15 to July 26 on January 28, March 13, and June 11, 2002. Each time, she was told by her supervisors that she could not take her annual vacation during that period, but could instead take her second choice for leave, December 28, 2002 through January 6, 2003. Although plaintiff states she was injured on April 2, 2002, she made no mention of this injury to her superiors against whom she now pursues the claims at issue here. Indeed, the first that Ms. Muirhead heard of any medical condition affecting plaintiff was upon her presenting a note on July 9, 2002, just

days before the start of her first choice of leave. The note stated that due to hyperthyroidism, migraines, and hyperlipidemia, she had been advised to take absolute bed rest for three weeks, until August 1, 2002.[16] *See* Note from Dr. Hector Rodriguez Navarro, dated July 9, 2002. Her supervisors reasonably found suspect plaintiff's claim that she suddenly needed sick leave which nearly identically coincided with the leave period she requested but was denied. We find credible Ms. Muirhead's assertion that she could not properly run her department if every time an employee was denied their choice in annual leave, they could still take paid leave by stating they were sick. Muirhead Dep. at 131–32. Employees would undoubtedly take advantage of this loophole, leaving the department understaffed during popular vacation periods. The initial denial of plaintiff's sick leave was subsequently reversed after proper administrative procedures were followed. In addition, the time which lapsed between plaintiff's denial of sick leave and the administrative reversal of that decision cannot be characterized as needlessly excessive and indeed is attributable in large measure to the pace her union chose to adopt. Accordingly, we

believe that defendant had legitimate business reasons for initially denying plaintiff her sick leave request.

## CONCLUSION

For the foregoing reasons defendant's motion to dismiss is granted in its entirety.

**IT IS SO ORDERED.**

---

**16.** We note that although plaintiff points to her fall while on the job in April as the catalyst for her medical health which demanded that she take this period of time from work, the medical conditions which are described in her doctor's note do not seem to be conditions that commonly associated with physical injuries from a fall. Indeed, all the conditions recited in the July note are properly described as chronic rather than acute.

In addition, plaintiff has submitted two additional doctor's notes which she alleges were presented to Ms. Muirhead after the initial denial of plaintiff's sick leave request. The first reads: "Noemi [sic] Figueroa has not improved. She must keep bed rest until Sept. 3, 2002." Note from Dr. Hector Rodriguez Navarro, dated Aug. 1, 2002. The second reads: "Noemi [sic] Figueroa is still under physical therapy. She's also being evaluated

for a breast mass which will require a biopsy on Sept. 20, 2002. She may return to work 10/1/02." Note from Dr. Hector Rodriguez Navarro, dated Sept. 3, 2002. Plaintiff's counsel, in a letter to this Court, states that he has no explanation as to why the back pain plaintiff allegedly was suffering from was not mentioned in any of these letters. *See* Letter from Perry S. Friedman to the Court, dated Mar. 1, 2007. Further, assuming plaintiff's account was true, these doctor's notes were submitted after administrative procedures had begun to resolve plaintiff's grievance in having been denied sick pay. Although they are relevant to the question of whether plaintiff was indeed sick, they do not speak to whether defendant had a legitimate business reason to be suspicious of plaintiff's claim for sick leave when it was denied.